PEOPLES NATIONAL BANK OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN B. FOWLER, DEFENDANT, AND MAURICE L. STONEHILL, DEFENDANT-APPELLANT.

Argued October 25, 1976—Decided April 21, 1977.

90

Mr. *David J. Goldberg* argued the cause for appellant (*Messrs. Warren, Goldberg & Berman,* attorneys).

Mr. *Igor Sturm* argued the cause for respondent (*Messrs. Charles, Sturm & Segal,* attorneys).

The opinion of the court was delivered by

SCHREIBER, J. Is an owner of stock, which had been transmitted to a bank as collateral security for a loan to a third person, entitled to the return of the stock because in making the loan the bank violated the federal margin requirements of Regulation U, 12 *C. F. R.* § 221.1 *et seq.* (1976), and the usury laws of New Jersey, *N. J. S. A.* 31:1–1 *et seq.*? This issue arose in the context of an action by the Peoples National Bank of New Jersey (PNB) against John B. Fowler, Jr. on a note in the face amount of $350,000, secured by 24,013 shares of common stock of the Jeannette Glass Company (Glass Company) owned by Maurice Stonehill. PNB joined Stonehill as a party defendant to compel him to remove a stop-transfer order placed against the stock with the Glass Company. The defendant Stonehill counterclaimed seeking delivery of the stock certificates of 24,013 shares and crossclaimed against Fowler for any losses to which Stonehill might be subjected in the main suit.

At the conclusion of the trial, the trial court entered a judgment of $218,313 in favor of PNB against Fowler, ordered Stonehill to remove all restrictions prohibiting the transfer of the 24,013 shares of Jeannette Glass Company common stock, authorized PNB to sell the stock and apply

the proceeds to the indebtedness, dismissed Stonehill's counterclaim against PNB, and entered a judgment of $218,313 in favor of Stonehill against Fowler, less the market value of any shares which were not needed to satisfy the principal indebtedness and which PNB was to return to Stonehill.

The Appellate Division affirmed the judgments essentially for the reasons stated by the trial court in its written opinion. We granted Stonehill's petition for certification limited to consideration of whether Maurice L. Stonehill is entitled to recover his stock.[1]

Fowler was the Chief Executive Officer and principal stockholder of a stock brokerage firm, J. S. Love and Co., Inc. (Love). Love, as a member of the New York Stock Exchange, had to maintain certain asset-to-liability ratios in accordance with the Exchange's regulations. When Love's ratios fell below those minima, Fowler borrowed funds, which he in turn advanced to Love, so that Love's qualifications as a member of the Exchange remained unimpaired.

Fowler borrowed $250,000 from Chemical Bank New York Trust Company (Chemical) on May 6, 1970 for a six-month period and deposited 24,013 shares of Jeannette Glass Company common stock with Chemical as collateral for the indebtedness. The stock was owned by Maurice Stonehill, who was the Chairman of the Board of Directors of the Glass Company and owned more than 10% of its issued and outstanding common stock. Stonehill had been a longtime friend of Fowler and as a favor to him (he received no compensation) had forwarded the stock certificates endorsed in blank with appropriate powers of attorney to be used as security in connection with the Chemical loan. The funds from the Chemical advance became part of the working

---

[1] The order granting certification also included the issue of whether there had been a violation of Regulation U. The trial court found Regulation U had been violated and on oral argument PNB conceded that violation. Accordingly, that issue will not be addressed here.

capital of Love and were used in its stock brokerage business for carrying customers' margin accounts and for buying and selling securities.

Fowler was unable to make payment on the due date, November 6, 1970, and when Chemical indicated it desired repayment, Fowler searched for other banking sources, principally in New York City, to refinance the unpaid balance of the Chemical indebtedness and to obtain additional funds for Love, which was again in need of an infusion of capital. These efforts proved fruitless. By February 1, 1971, Chemical was demanding payment of the unpaid principal sum of $196,350 plus $12,246 interest and threatening to sell the pledged stock.

Around February 24, 1971, William G. Rohrer, President of PNB, indicated an interest in refinancing the Chemical loan and Fowler met with Rohrer and Francis Mason, a Vice-President, at PNB's office in Laurel Springs, New Jersey, on March 1, 1971. Fowler advised the bank of the Chemical loan, of Stonehill's pledged stock, and of Stonehill's control relationship with Jeannette Glass Company. An agreement was reached under the terms of which Fowler would execute a note in the face amount of $350,000, bearing interest at the rate of 8% per annum, repayable in 11 equal monthly installments of $10,000 commencing April 15, 1971, with the balance due on the twelfth month. The note was to be secured by 24,013 shares of Jeannette Glass Company common stock owned by Stonehill and a $50,000 non-interest bearing certificate of deposit. Fowler also agreed to open a checking account where he would keep a compensating balance of $5,000. The note was prepared and signed at that time.

On March 2, 1971, Fowler closed the loan at PNB. Francis Mason represented PNB. At the closing Mason prepared Federal Reserve Form U-1, which was entitled a "Statement of Purpose of a Stock-Secured Extension of Credit by a Bank" and is commonly known as a Regulation U purpose statement. It was signed by Fowler and Mason. The statement reflected the fact that the collateral for the loan was

24,013 shares of Jeannette Glass Company stock having a market price of $24 per share. The printed form stated that the undersigned (Mason) as a duly authorized officer of the bank was aware that the stock-secured credit may be subject to Regulation U, a regulation which under certain circumstances limited the amount of money which could be borrowed where stock was pledged as collateral for a bank loan. The form further stated that the bank officer must act in good faith, which requires that such officer (1) must be alert to the circumstances surrounding the credit, and (2) has made a reasonable investigation if he has any information which would cause a prudent man not to accept the statement without inquiry. No inquiry had in fact been made by PNB directed to Stonehill, the Chemical Bank, or even to Fowler to determine whether the proposed loan would violate Regulation U.

Fowler also delivered at the closing a letter from Stonehill addressed to PNB, dated February 26, 1971, in which he authorized Fowler to use 48,017 shares of Jeannette Glass Company common stock registered in his name as collateral for a loan which PNB was making to Fowler. This letter had previously been executed by Stonehill, undated and with no addressee, and given to Fowler. Stonehill had known that Fowler was attempting to renegotiate the Chemical loan, but he was not aware of any of the details of the PNB transaction. He did not know his stock had been pledged with PNB until sometime after the transaction had been concluded. For his part, Fowler admitted that he was familiar with the details of Regulation U and that he was aware at the time the loan transaction with PNB was completed that Regulation U had been violated.

The proceeds from the PNB loan were used as follows:

(a.) $210,000 was sent to Chemical to satisfy the balance due on its loan. Chemical in turn transmitted to PNB certificates for 24,013 shares of Jeannette Glass Company common stock registered in Stonehill's name with stock powers of attorney signed by Stonehill.

(b) $50,000 was used to purchase the non-interest bearing certificate of deposit, which was left with PNB.

(c) $5,000 was used by Fowler to open a checking account at PNB.

(d) The remainder, $85,000, was deposited in Fowler's checking account in a New York bank from which the following distribution was made:

 (1) $45,000 was used to purchase preferred stock in Love to provide additional working capital for that company;

 (2) $12,000 was paid as a finders' fee for arranging the loan;

 (3) $25,000 went to the American Bank and Trust Co. in Reading, Pa. to repay a loan that Fowler had previously made on behalf of Love.

Fowler was almost immediately in default when he failed to pay the first installment due on April 15, 1971. However, Fowler thereafter paid six installments. In May 1972, PNB declared the indebtedness in default and applied the $50,000 certificate of deposit against the principal balance. As of May 16, 1972 the remaining balance due and owing including interest was $246,146.98. PNB was unable to sell the stock collateral because Stonehill's counsel directed the Glass Company's transfer agent not to honor a transfer of the stock.

The trial court found that the PNB loan transaction had violated the Regulation U margin requirements and the New Jersey usury laws.[2] Regulation U, 12 *C. F. R.* § 221.1 *et seq.* (1976),[3] had been promulgated by the Federal Reserve Board

---

[2] The statute in effect on March 1, 1971 limited interest to 6% per annum, subject to the authority of the Commissioner of Banking and Insurance to raise the rate to 8%, *L.* 1968, *c.* 55, § 1, which he had done on April 15, 1970. 2 *N. J. R.* 38(a) (1970).

[3] Regulation U states:

§ 221.1 General rule.

(a) *Purpose credit secured by stock.*

(1) Except as provided in subparagraph (2) of this paragraph (a) and in § 221.3(q) no bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any margin stock in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time for stocks in § 221.4 (the Supplement to Regulation U) and as determined by the bank in good faith for credit subject

pursuant to authority granted under section 7 of the Securities Exchange Act of 1934.[4] Section 7 authorized the Board of Governors of the Federal Reserve System to enact rules and regulations with respect to the amount of credit which may be extended on any security. Regulation U serves to limit the amount of credit a bank may extend to a borrower where the purpose of the loan is to purchase or carry margin securities and where the loan is collateralized directly

to § 221.3(s) for any collateral other than stocks: *Provided*, That unless held as collateral for such credit on October 20, 1967, and continuously thereafter, any collateral other than stock shall have loan value for the purpose of this part only as collateral for a credit which is not secured by stock, as described in § 221.3(s), and any collateral consisting of convertible debt securities described in § 221.3(t) shall have loan value only for the purpose of that section, and not for other credit subject to this part.

§ 221.4 Supplement

(a) *Maximum loan value of stocks.*
For the purpose of § 221.1, the maximum loan value of any stock except puts, calls and combinations thereof, whether or not registered on a national securities exchange shall be 35 percent of its current market value, as determined by any reasonable method. Puts, calls, and combinations thereof shall have no loan value.

[4]In pertinent part the Securities Exchange Act of 1934, § 7, 15 *U. S. C.* § 78g (1971) provides:

(a) For the purpose of preventing the excessive use of credit for the purchase or carrying of securities, the Board of Governors of the Federal Reserve System shall . . . prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security. . . .

* * * * * * * *

(d) It shall be unlawful for any person not subject to subsection (c) of this section to extend or maintain credit or to arrange for the extension or maintenance of credit for the purpose of purchasing or carrying any security in contravention of such rules and regulations as the Board of Governors of the Federal Reserve System shall prescribe to prevent the excessive use of credit for the purchasing or carrying of or trading in securities in circumvention of the other provisions of this section. . . .

or indirectly by any stock.[5] Operationally, this is accomplished by setting a maximum loan value on the shares pledged as collateral. The primary goal of the regulation was to curb excessive stock speculation credit transactions. At the time of the PNB loan, the maximum amount that could be loaned was 35% of the market value of the stock pledged.[6]

Since Fowler was cognizant of the Regulation U violation at the time of the loan, the trial court refused to void the entire transaction. Instead, it rescinded the contract, denying PNB the right to receive any interest while requiring Fowler to tender to the bank the amount of the principal of the loan. Further, the court held that Stonehill, who had not participated in any of the negotiations preceding the loan, had no standing to raise the defense of a Regulation U violation as he was "a mere stranger to the entire transaction."

The factual conclusion that Stonehill had no contractual or other legal relationship with PNB is belied by the undisputed facts. PNB knew that the stock which was being pledged by Fowler was owned by Stonehill. This was evident from Fowler's February 24, 1971 letter to Rohrer (which was received before the loan agreement was made on March 1) in which Fowler advised Rohrer that not only was the stock owned by Stonehill, but also that Stonehill was a controlling stockholder. Because this was control stock, under Rule 154 of the Securities and Exchange Commission, promulgated pursuant to the Securities Act of 1933, only limited quantities could be sold on the American Stock Exchange, where

---

[5] 12 *C. F. R.* § 221.1(a) (1976). Both of these conditions must exist in order for the loan to fall within the ambit of Regulation U.

Since Regulation U only applies to bank loans collateralized by stock where the proceeds are used for the purpose of purchasing or carrying margin securities, these loans are referred to as "purpose loans."

[6] This 35% maximum loan value was in effect from May 6, 1970 to December 3, 1971. The present maximum loan value is 50%. 12 *C. F. R.* § 221.4(a) (1976).

the stock was listed, every six months. 19 *Fed. Reg.* 9375–9376 (1954).[7] Furthermore, at the closing PNB received a letter signed by Stonehill in which he authorized the use of the stock as collateral for the loan. And Francis Mason, PNB's Vice-President, was advised by Chemical of the stock's status when arrangements were being made for transmittal of the stock certificates and satisfaction of the Fowler indebtedness to Chemical.

Stonehill was joined as a party defendant to this litigation because PNB recognized that he was a necessary party. Stonehill's interest in the transaction, as owner of the pledged stock and as surety or guarantor to the extent of the pledged stock, is apparent. Some of his rights as owner of the pledged stock are expressed in the Uniform Commercial Code. *N. J. S. A.* 12A:9–112 provides that:

> . . . when a secured party knows that collateral is owned by a person who is not the debtor, the owner of the collateral is entitled to receive from the secured party any surplus under 12A:9–502(a) or under 12A:9–504(1), and is not liable for the debt or for any deficiency after resale, and he has the same right as the debtor
> (a) to receive statements under 12A:9–208;
> (b) to receive notice of and to object to a secured party's proposal to retain the collateral in satisfaction of the indebtedness under 12A:9–505;
> (c) to redeem the collateral under 12A:9–506;
> (d) to obtain injunctive or other relief under 12A:9–507(1); and
> (e) to recover losses caused to him under 12A:9–208(2).

Further, Stonehill's relationship to PNB and Fowler squarely meets, as the plaintiff concedes, the definition of surety as described in § 36 of the *Restatement of Security* (1941):

> (1) Where a pledge is made as security for the obligation of a third party, the pledgor is a surety to the extent of the pledged chattel.

---

[7] Rule 154 was subsequently superseded by Rule 144, 17 *C. F. R.* § 230.144 (1976), effective April 15, 1972.

(2) Where a third person authorizes the pledge of his chattel to secure the obligation of a pledgor and this fact is known to the pledgee, the owner of the chattel is a surety to the extent of the pledged chattel.

■ Although the *Restatement* classifies Stonehill's status as a surety, traditionally he would have been designated a guarantor.[8] In the classical suretyship, the surety was a party to the primary obligation — both the debtor and the surety executing the same instrument and uniting in the same promise. In a contract of guaranty there were two distinct agreements, one made by the principal debtor and the other by the guarantor, the guarantor's contract normally created with the creditor. In the above context, Stonehill's agreement would be considered that of a guarantor. Stonehill offered his Jeannette Glass Company common stock to PNB as collateral for a loan which PNB was proposing to make to Fowler. PNB, relying upon that proposal, made the loan. No one asserts that Stonehill's guarantee required a formal notice of acceptance. Since Fowler did not promise or give Stonehill any consideration, Stonehill was free to withdraw his consent to the use of his stock as collateral. However, once PNB advanced the funds, Stonehill's guarantee to PNB became binding and he could not have then demanded the return of his stock. *Stearns, Law of Suretyship* § 2.8 and § 4.9, at 71 (5th ed. 1951); *Restatement of Security* § 86 (1941); *Restatement of Contracts* § 45 (1932); Annot., 6 *A. L. R.* 3d 355 (1966); 38 *Am. Jur.* 2d *Guaranty* §§ 42, 43 (1968).

■ Under all these circumstances, Stonehill's standing to raise defenses and assert his claim to his stock is abundantly

[8]The *Restatement's* terminology treats a guaranty as synonymous with a suretyship. *Restatement of Security* § 82, Comment g. The modern view is to consider the obligation of the third person as contractual and to direct the inquiry to that particular undertaking, usually in the form of a promise to the creditor. *Cf. Bigelow, Bills, Notes and Checks* § 447 and § 448 at 346 (3rd ed. 1928) with *Restatement of Security* § 82.

clear. In a related case involving similar facts, *Stonehill v. Security National Bank and Fowler*, 68 *F. R. D.* 24 (1975), the United States District Court for the Southern District of New York reached the same result.

The trial court relied on *Natkin v. Exchange Nat'l Bank of Chicago*, 342 *F.* 2d 675 (7th Cir. 1965), as persuasive authority to the contrary. In *Natkin* the plaintiffs had delivered stock certificates endorsed in blank to the debtor who pledged these as additional collateral for a loan which violated Regulation U. On its face it appeared that the borrower was the sole owner of the collateral. The lending bank had no knowledge that ownership had not been transferred to the borrower and the bank in no way participated in the arrangement between the plaintiffs and the borrower. Further, it was conceded that the plaintiffs were strangers to the loan transaction and that no contractual relationship existed between the plaintiffs and the bank. 342 *F.* 2d at 676. Since there was no legal or other contractual relationship between the plaintiff and the bank, plaintiffs could not complain of the Regulation U violation. That case is inapposite, for here the pledgee bank, PNB, knew prior to the loan that the stock belonged to Stonehill, who had consented to the pledge of his stock as security for a loan to Fowler in his letter to the bank dated February 26, 1971. He had the right, in the context of the circumstances, as pledgor, guarantor and surety, to interpose defenses and assert his claim to the unfettered return of his stock predicated on his interest in the transaction.

 Stonehill's offer to the bank was to use his shares of Jeannette Glass Company common stock as collateral for a loan to be made to Fowler. Stonehill's letter contained no terms or provisions other than providing that the securities could be sold if Fowler defaulted on payment of the loan and that any other securities pledged by Fowler would be liquidated first. In construing Stonehill's obligation, adherence to the principle that a guarantor's or surety's duty should be strictly construed is in order, particularly where

the guarantor or surety is uncompensated.[9] Chief Justice Vanderbilt in *Monmouth Lumber Co. v. Indemnity Ins. Co. of N. America*, 21 *N. J.* 439, 452 (1956) wrote:

It has long been settled law that a surety is chargeable only according to the strict terms of its undertaking and its obligations cannot and should not be extended either by implication or by construction beyond the confines of its contract, *Skillman v. United States Fidelity & Guaranty Co.*, 101 *N. J. L.* 511 (E. & A. 1925); *Boorstein v. Miller*, 124 *N. J. Eq.* 526 (Ch. 1938); *cf. Southern Surety Co. v. Bender*, 41 *Ohio App.* 541, 180 *N. E.* 198 (1931).

█ Implicit in the pledge as a matter of law was the condition that the loan should conform to and be in accordance with the law, including the Regulation U requirements. There having been a violation of Regulation U, attention is next directed to the effect of that violation on Stonehill's agreement.

█ The Securities Exchange Act of 1934 provides that:

Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . the performance of which involves the violation of . . . any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . . [15 *U. S. C. A.* § 78cc (b) (1971)]

Since Regulation U imposed the duty on the bank not to extend credit beyond the prescribed guidelines,[10] the Act would appear to invalidate only the lending bank's rights.

---

[9]The *Restatement of Security* distinguishes between compensated and uncompensated sureties. For example, where time for payment of a debt has been extended an uncompensated surety is discharged whereas a compensated surety is discharged only to the extent that he is harmed by the extension. *Restatement of Security* § 129 (1941).

[10]Subsequently, Regulation X was adopted which prohibited borrowers from obtaining credit in violation of Regulation U. 12 *C. F. R.* § 224 (1976).

It is well settled that private causes of action may be predicated on a statutory violation. *Pearlstein v. Scudder & German,* 429 *F.* 2d 1136 (2d Cir. 1970), *cert.* denied 401 *U. S.* 1013, 91 *S. Ct.* 1250, 28 *L. Ed.* 2d 550 (1971) ; 3 *Loss, Securities Regulation* 1757–1763 (2d ed. 1961). Some courts have held that the bank, having sold the collateral and applied the proceeds to the loan, is deprived of its right to recover a deficiency. *Grove v. First National Bank of Herminie,* 489 *F.* 2d 512 (3d Cir. 1974) ; *Cooper v. Union Bank,* 354 *F. Supp.* 669 (C. D. Cal. 1973), rev'd on other grounds, 527 *F.* 2d 762 (9th Cir. 1975) ; *Serzysko v. Chase Manhattan Bank,* 290 *F. Supp.* 74 (S. D. N. Y.), aff'd mem. 409 *F.* 2d 1360 (2d Cir. 1968), *cert.* denied 396 *U. S.* 904, 90 *S. Ct.* 218, 24 *L. Ed.* 2d 180 (1969). Another remedy which has been applied is to permit the bank to recover the principal on the loan without the interest. *Goldman v. Bank of Commonwealth,* 332 *F. Supp.* 699 (E. D. Mich. 1971), aff'd 467 *F.* 2d 439 (6th Cir. 1972). However, where the borrower's false and misleading representations to the bank have induced the loan, and the bank has violated Regulation U, the borrower has been denied affirmative relief for damages. *Goldman v. Bank of Commonwealth,* 332 *F. Supp.* at 706–707; *Serzysko v. Chase Manhattan Bank,* 290 *F. Supp.* at 90.

██ The trial court equated Fowler's conduct with that of the fraudulent borrower because Fowler, a sophisticated securities dealer, knowing that his proposed loan with plaintiff violated Regulation U, intentionally did not disclose that fact to PNB. But Stonehill cannot be placed in the same *pari delicto* classification. He was not guilty of any wrongdoing in connection with the PNB loan. He was an uncompensated gratuitous guarantor and the reasons for denying Fowler relief would be inapplicable to Stonehill, for Stonehill's obligation to PNB arises out of an independent, albeit subordinate, contract.

██ ██ It is a general rule that, if the condition upon which the guarantor agrees to become bound is not complied with, the guarantor is discharged. *Brandt, Law of Surety-*

*ship and Guaranty* § 350, at 471 (1878).[11] We find that where the uncompensated guarantor's obligation contemplated a bank loan which would be made in accordance with the law, the bank's violation discharges that obligation and the pledgor is entitled to the return of his stock.

The judgment of the Appellate Division is modified in accordance with this opinion, and as modified affirmed.

*For affirmance as modified* — Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD — 7.

*For reversal* — None.

---

[11]A comparable rule may be found in § 124 (1) of the *Restatement of Security* (1941) which provides that:

Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.