THE HARTFORD FIRE INSURANCE COMPANY, PLAINTIFF-RE-
SPONDENT, v. RIEFOLO CONSTRUCTION CO., INC.; THE
CONDITIONING CO., INC.; FLUORO ELECTRIC CORPORA-
TION; ELIZABETH IRON WORKS, INC.; GROVE PLUMBING
& HEATING CO.; THE HOME INDEMNITY CO.; EMPLOYERS
COMMERCIAL UNION INSURANCE CO.; THE MARYLAND
CASUALTY CO.; AND THE AMERICAN INSURANCE CO., DE-
FENDANTS-APPELLANTS, AND THE BOARD OF EDUCA-
TION OF THE VOCATIONAL SCHOOLS IN THE COUNTY OF
ESSEX AND UNITED STATES FIDELITY & GUARANTY CO.,
DEFENDANTS, AND SENTRY INSURANCE, DEFENDANT-
RESPONDENT.

Argued September 10, 1979—Decided January 17, 1980.

Mr. *Robert C. Gruhin* argued the cause for appellant Riefolo Construction Co.

Mr. *Arnold L. Simon* argued the cause for appellants The Conditioning Co., Inc. and Employers Commercial Union Insurance Co.

Mr. *Barry Blum* argued the cause for appellant The Maryland Casualty Company (*Messrs. Press & Blum*, attorneys).

Mr. *Allan Maitlin* argued the cause for appellants Elizabeth Iron Works, Inc. and Grove Plumbing & Heating Co. (*Messrs. Feuerstein, Sachs & Maitlin*, attorneys).

Mr. *Ernest Prupis* argued the cause for apellant The American Insurance Co. (*Messrs. Weltchek, Prupis* and *Ritz*, attorneys).

Mr. *Charles H. Hoens* argued the cause for respondent The Hartford Fire Insurance Co. (*Messrs. Lum, Biunno* and *Tompkins* attorneys; *Mr. Hoens*, of counsel; *Mr. David C. Dreifuss* on the brief).

Mr. *John J. Ronca* argued the cause for respondent Sentry Insurance (*Messrs. Ronca* and *McDonald*, attorneys).

The opinion of the court was delivered by
PASHMAN, J.

This case involves questions of contract interpretation arising from a fire at a public construction project. Preliminarily, we consider the right of plaintiff insurance company to sue in subrogation on its insured's contract claims. Finding that such a suit may be maintained, we next determine which of the

parties to the construction contracts should bear the risk of loss due to fire occurring prior to completion of construction. We hold that the risk lay with defendant contractors, and that their sureties, also defendants, may be held liable should the contractors fail to satisfy plaintiff's claims.

In April 1972, the Board of Education of Vocational Schools in Essex County (Board) engaged the five defendant contractors [1] to construct the Essex County Technical Careers Center in Newark, New Jersey. The contracts between the Board and each builder incorporated a set of "General Conditions" and "Special Conditions." The General Conditions were promulgated by the Economic Development Administration of the United States Department of Commerce (EDA), which was financing the construction. The Special Conditions had been drafted by the building's supervising architect.

Section 28(e) of the General Conditions obliged each contractor to procure and maintain builder's risk insurance "during the life of [the] contract on the insurable portion of the project." Before construction began, each builder notified the Board that it had secured all necessary insurance. Section 29 of the General Conditions required each contractor to obtain a performance bond in an amount equal to its contract price as security for complete performance. Each obtained such a bond, executed on a standard EDA form, from one of the surety defendants.[2] Sections 13 of the General Conditions and 1.39 of the Special Conditions obligated the contractors to repair any and all damage to the building occurring prior to its acceptance, unless such damage was due to fault of the Board. Section 1.37 of the

---

[1] Riefolo Construction Company, Inc. (Riefolo), The Conditioning Company, Inc. (Conditioning), Fluoro Electric Corporation (Fluoro), Elizabeth Iron Works, Inc. (Elizabeth), and Grove Plumbing and Heating Company (Grove).

[2] The Home Indemnity Co., Employers Commercial Union Insurance Co., the Maryland Casualty Co., and the American Insurance Co.

Special Conditions stated that acceptance occurred only when all work including all minor punch-list items, was complete.

In April 1972, each contractor received a written "Notice to Proceed," which stated that the scheduled completion date was October 2, 1973. Construction was still not complete on April 1, 1974. At that time the Board determined that it needed to assign employees to the Careers Center to prepare for the 1974–1975 school year. On May 17, 1974, the architect wrote the Board that its staff could use the executive office area but that "no educational process may be carried on until the building is 100% complete and inspected and approved by the Division of School Building Services of the State Department of Education." In June 1974 certain personnel were assigned to the building. By August 8, the day before the fire, 16 persons, including 6 teachers, had been assigned to the building, and Board employees occupied the entire first floor and the library on the second floor. Portions of the third floor were being used to store furniture. Employees were interviewing prospective students at the site but no classes had been held there.

Construction continued while the Board was using the building. By August 8 the building was between 90% and 95% complete. On that date, the Board ordered casualty insurance from Hartford for the project's completed portion. Hartford supplied such coverage and a binder was issued evidencing coverage in the amount of $6,500,000 commencing that same day.

On the next day, August 9, a fire of undetermined origin started on the third floor of the building, causing $250,000 in damage. After two subsequent job site meetings, the Board notified all contractors to begin repair work. In a telegram sent to four of the builders, the Board stated that its payments for the work would be reimbursed by its own insurer and the

contractors' builder's risk carriers.[3] The Board and Hartford later reached an agreement whereby Hartford would advance repair monies on condition that it be subrogated to the Board's claims against the contractors. The contractors were paid with the monies so advanced.

When the Board and Hartford sought reimbursement from the contractors' builder's risk insurers, they found that Elizabeth, Fluoro and Riefolo had allowed their policies to lapse in July 1973, July 1974 and April 1974 respectively, without giving the Board prior notice as required by section 28(f) of the General Conditions. Only Grove and possibly Conditioning[4] had continued their coverage. Hartford then notified the contractors and their sureties of its intention to assert claims against them.

On April 11, 1975, Hartford brought suit in Superior Court, Chancery Division, to recover the monies it had paid to the Board which had in turn paid the contractors. The complaint named as defendants the five contractors, their sureties and the Board. Hartford alleged that the contractors had breached their agreements by failing to repair the fire damage at their own expense, and that all contractors except Grove were also in breach for failure to maintain builder's risk insurance.

The defendant contractors claimed that an insurer could be subrogated only to tort and not to contract claims, and that therefore Hartford could not bring the present suit. They further asserted that Hartford was estopped from enforcing the right to subrogation due to its "inequitable" conduct following the fire.

In addition to these defenses, defendants challenged their underlying liability to the Board on numerous other grounds.

---

[3] Only Elizabeth was not notified by telegram. However, a proposal for repair work was submitted and a change order received.

[4] Conditioning's insurance coverage became the subject of separate litigation between Conditioning and its insurer and is not at issue in this appeal.

The contractors asserted that since either the "substantial completion" of the building or its occupancy by the Board at the time of the fire would have voided builder's risk coverage, any failure to maintain such insurance did not injure the Board. By reason of the alleged unavailability of builder's risk coverage, defendants claimed that a proper construction of the contract shifted the risk of loss to the Board.[5] Alternatively, defendants urged that because the fire had started among cartons stored by the Board, it was responsible for the damage and must absorb the loss. The defendants also alleged that the Board had breached section 57 of the General Conditions by occupying the building without the written consent of either the contractors, their insurers or their sureties. It is alleged that such occupancy would have terminated the policies had they been in effect.

Defendant surety companies claimed that their performance bonds did not cover fire repairs. The pre-trial order provided that the sureties would not participate in the trial on the issue of the contractors' liability, but would be free to litigate whether such liability, if established, was covered by the performance bonds.

The case was tried on a *stipulated factual record.* In an unreported opinion, the trial court held that Hartford could maintain the suit as the Board's subrogee without any showing of "superior equities." The court did not consider the claims of Hartford's inequitable conduct.

On the merits, the court held that the provisions requiring the contractors to repair all damage should be read together with their obligation to maintain builder's risk insurance. According to that analysis, the risk of loss would remain on the builders only while it was possible to maintain such coverage. The court found that the Board was occupying the building and that

[5] Grove and Conditioning asserted they had maintained builder's risk coverage. Hartford thereafter amended its complaint to add United States Fidelity & Guaranty Company and Sentry Insurance, their carriers, as defendants.

construction was "substantially" complete at the time of the fire. It further found that builder's risk insurance would not have provided coverage on the occurrence of either event. The court therefore held that the risk of loss had passed to the owner; thus the contractors were excused from their obligation to maintain insurance and did not bear the risk of loss. The court also ruled that contractors' failure to notify the Board of the lapse of their policies was a breach without a loss. By obtaining insurance on August 8 without the required notice, the Board did precisely what it would have done with notice. Judgment was accordingly entered for defendants.

Plaintiff appealed from this judgment and the Appellate Division reversed and remanded. 161 *N.J.Super.* 99 (App.Div. 1978). That court agreed that Hartford was not barred from suing as subrogee, but disagreed with the trial court's construction of the contract provisions. The Appellate Division concluded that the risk of loss during construction is borne by the builder absent contrary contractual language. Holding that the insurance requirement did not alter this general rule, the court found the provision imposing the obligation to repair separately enforceable without reference to insurance availability. This result rendered unnecessary discussion of occupancy or substantial completion. Finally, the court concluded as a matter of law that the language of the performance bonds encompassed the liability of the surety for breach of contractor's duty to repair fire damage.

The Appellate Division remanded the case for determination of damages and their apportionment among the defendants, including any sureties who were found liable on their performance bonds. The Appellate Division supplemented its opinion to make clear that sureties' defenses other than non-coverage could be asserted on remand. We granted certification. 79 *N.J.* 475 (1979). We now affirm.

## I

Subrogation is an equitable doctrine designed "to compel the ultimate discharge of an obligation by the one who is good conscience ought to pay it." *Standard Accident Ins. Co. v. Pellecchia,* 15 *N.J.* 162, 171 (1954). In its absence, either the insured would collect twice or the third party wrongdoer would go free. *Id.;* see *Ambassador Ins. Co. v. Montes,* 76 *N.J.* 477, 485 (1978). While courts in earlier cases were somewhat reluctant to permit subrogation based on contractual obligations of a third party, "[i]t is now well settled generally that such an action in subrogation on the contractual obligation of the defendant to an insured exists in favor of the insurer." *Standard Accident Ins. Co. v. Pellecchia,* 15 *N.J.* at 178. As we made clear in *Pellecchia,* the subrogee need not show "superior equities," but the conduct of insured and insurer must not be such as would make the granting of relief unconscionable. *Id.* at 182, 188–189.

In the stipulated record before us, there is no indication that Hartford or the Board engaged in "unconscionable" or inequitable conduct. Three specific assertions of inequitable conduct were addressed by the Appellate Division. 161 *N.J.Super.* at 109–110. The first, that Hartford changed the form of insurance after the fire, is without merit. The other contentions depend on a finding that Hartford or the Board assured contractors that they would not have to reimburse repair payments, thus inducing them to abandon their investigation into the cause of the fire. The record contains no evidence that such assurances were given. There is also no indication that anyone except the Newark Fire Department investigated the fire. This Court is bound by the parties' factual stipulations. See *Ambassador Ins. Co. v. Montes,* 76 *N.J.* at 481–482; *Del Veccio v. Hood,* 4 *N.J.Super.* 254, 259 (App.Div.1949). We therefore agree with the Appellate Division and trial court that neither Hartford nor the Board engaged in inequitable or unconscionable conduct.

This determination brings us to the merits of Hartford's claims. As subrogee, Hartford "steps into the shoes of the Board." It can prevail only if there are no defenses which would defeat recovery by the Board. *Pellecchia*, 15 *N.J.* at 172. We now turn to the Board's claims and the contractors' defenses.

## II

The general rule is that the risk of loss during construction rests with the builder, assuming the owner to be free from fault. *Matthews Construction Co. v. Brady*, 104 *N.J.L.* 438, 443 (E. & A. 1928); *Board of Ed. of Woodbridge v. Kane Acoustical Co., Inc.*, 51 *N.J.Super.* 319, 327 (App.Div.1958) (dicta); *School Trustees of Trenton v. Bennett*, 27 *N.J.L.* 513 (Sup.Ct.1859). See also *United States v. Spearin*, 248 *U.S.* 132, 136, 39 *S.Ct.* 59, 61, 63 *L.Ed.* 166, 169 (1918) ("Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered."); *Lititz Mutual Ins. Co. v. Lengacher*, 248 *F.*2d 850, 853 (7th Cir. 1957); *John McShain, Inc. v. United States*, 375 *F.*2d 829, 834, 179 *Ct.Cl.* 632 (1967); 18 S. Williston, *Contracts* § 1964 (3d ed. 1978); 13 *Am.Jur.*2d, *Building and Construction Contracts*, § 64 (1964). This rule is subject to contractual modification; parties may therefore provide for a different allocation of the risk. See *School Trustees of Trenton v. Bennett*, 27 *N.J.L.* at 519–520.

By clear and specific language, section 1.39 of the Special Conditions and section 13 of the General Conditions place the risk of loss or damage upon the contractors until the project is "accepted" by the Board, unless a contractual error or the Board's own conduct caused the loss. Under Special Condition 1.37, acceptance occurs only when "all work is complete, including all punch-list items originating prior to the acceptance date." Occupation of the premises by the Board is specifically provided *not* to constitute acceptance. Thus the parties have not modified the common-law rule, but rather have expressly adopted it.

■ We agree with the Appellate Division that inclusion of a provision requiring a builder to maintain insurance does not implicitly modify this allocation of risk. There is no contract language conditioning the contractors' risk of loss on the availability of builder's risk insurance to the contractors. To the contrary, section 28(e) of the General Conditions requires that such insurance be maintained "during the life of this contract." The only circumstance in which the burden shifts under the contract is when the damage is due to fault of the Board. Evidence respecting the cause of the fire at the Careers Center is limited to a report by the Newark Fire Department dated August 9, 1974. It states that the cause was "[u]ndetermined" and may have been due to "a discarded cigarette thrown . . . by [unspecified] workers." There is thus nothing to support a conclusion that the Board caused the fire damage, a proposition as to which the contractors had the burden of proof.

■ Since it is undisputed that none of the contractors had completed its work, and since there is no indication that the Board was responsible for the fire, the contractors are liable for all fire damage, notwithstanding the advanced stage of construction and any occupation of the premises by the Board.

### III

■ The Appellate Division correctly concluded that the performance bonds provided for liability of the sureties for contractors' failure to repair fire damage.[6] The language describing the surety's obligation is unambiguous in its coverage of contractor's faithful performance of its "duties, all the undertakings, covenants, terms, conditions and agreements" of the contract with the Board. A performance bond issued to a

---

[6]While this issue was not reached at trial, on appeal counsel for the bonding companies filed briefs on the issue and participated in the oral argument. We therefore agree with the Appellate Division that the question whether the performance bonds included liability for fire repairs is properly before the Court.

contractor is primarily for the benefit of the person for whom the work is being performed. Given this purpose, the rule that a contract of suretyship is to be strictly construed in favor of the surety, see *Peoples National Bank of New Jersey v. Fowler,* 73 *N.J.* 88, 100–101 (1977), *cert.* den. *sub nom. Peoples National Bank of New Jersey v. Stonehill,* 434 *U.S.* 858, 98 *S.Ct.* 182, 54 *L.Ed.*2d 131 (1977), cannot operate to contradict the clear wording of the bond in this case.

■ As discussed in part II, *supra,* the repair and replacement of damage is plainly the contractors' duty. By failing to repair the fire damage at their own expense, the contractors did not faithfully complete their contracts. The contractors' breach is therefore covered by the performance bonds. As the Appellate Division made clear, the sureties remain free on remand to assert any defenses other than the scope of the undertaking.

## IV

Our resolution of the liability issue renders unnecessary any determination regarding "substantial completion" or the Board's occupancy as a defense to contractors' failure to maintain builder's risk insurance. However, we take this opportunity to note what we perceive to be serious flaws in the trial court's reasoning, left unresolved by the Appellate Division.

The builder's risk policy in this case provides coverage for damage to

> building or structure, *while in the course of construction,* including foundations (except as hereinafter excluded), additions, attachments, and all fixtures, machinery and equipment belonging to and constituting a permanent part of said building or structure * * * [emphasis supplied]

The trial court found that the Careers Center was no longer "in the course of construction" within the meaning of the insurance contract; thus builder's risk insurance was not maintainable. In reaching this conclusion, the court applied a "substantial completion" standard to ascertain the term of coverage. Hartford objected to the use of this standard, contending that this doc-

trine applies only to a contractor's right of recovery, and has no place in the setting of this case. We agree.

Although the building might have been "substantially complete" so as to permit recovery of the price on a construction contract, the use of that term to interpret the phrase "in the course of construction" in an insurance contract is inappropriate and misleading. The proper standard is that builder's risk coverage terminates when the building "is ready for the use or occupancy for which it was intended." *American & Foreign Ins. Co. v. Allied Plumbing & Heating Co.*, 36 *Mich.App.* 561, 194 *N.W.2d* 158, 161 (Ct.App.1971); *Property Owner's Materials Co. v. Byrne*, 176 *S.W.2d* 650, 652 (Mo.Ct.App.1944); *Cuthrell v. Milwaukee Mechanics Ins. Co.*, 234 *N.C.* 137, 66 *S.E.2d* 649, 651 (Sup.Ct.1951); Annot., "Builder's Risk Insurance Policies," 94 *A.L.R.2d* 221, 243–244 (1964). See also *Fireman's Fund Ins. Co. v. Millers' Mutual Ass'n*, 451 *F.2d* 1140, 1141 (10th Cir. 1971); *Hendrix v. New Amsterdam Casualty Co.*, 390 *F.2d* 299, 304 (10th Cir. 1968); *Daniel v. New Amsterdam Casualty Co.*, 221 *N.C.* 75, 18 *S.E.2d* 819, 820 (Sup.Ct.1942).

It is clear that the Careers Center had not reached this stage of completion. Certainly the contractors failed to sustain their burden of proving it had. The building was intended to be used as a school. This use was not possible because considerable construction work remained,[7] and because the project had not been inspected and approved by the Division of School Building Services, a prerequisite to student attendance. Thus the building was still "in the course of construction."

---

[7] The record shows that as of August 7, two days before the fire, 16 workmen were still on the job and at least the following work remained to be done: (1) installation of "vibration eliminators" and "unit duct connections" in the ventilation system; (2) installation of thermostats; (3) waterproofing of walls and floors; (4) repair of boiler room hatch; (5) installation of air compressors; (6) installation of shut-off valves on certain gas lines; (7) installation of "spray booth control"; (8) placing identification tags on all valves; and (9) replacement of auto shop oil tank "pump-out" pipe.

■ The trial court also went astray in accepting defendants' contentions that the Board's occupancy of the premises wrongfully voided or would have voided any builder's risk coverage in effect at that time. The policy provided:

> OCCUPANCY CLAUSE: It is a condition of the insurance * * * that the said building or structure shall not be occupied without obtaining the consent of this Company endorsed hereon with proper rate adjustment.

Occupancy as used in builder's risk policies is interpreted to mean putting the structure to the practical and substantial use for which it was designed. See *Reliance Ins. Co. v. Jones*, 296 *F.* 2d 71 (10th Cir. 1961); *Peterson v. Zurich Ins. Co.*, 57 *Mich.App.* 385, 225 *N.W.2d* 776 (Ct.App.1975); *American and Foreign Ins. Co. v. Allied Plumbing & Heating Co.*, 36 *Mich.App.* at 565, 194 *N.W.2d* at 161; *Cuthrell v. Milwaukee Mechanics Ins. Co.*, 234 *N.C.* at 140–141, 66 *S.E.2d* at 651–652; Annot., *supra*, 94 *A.L.R.* 2d at 244–247.

■ Although the proper standard for measuring "occupancy" was employed, the trial judge misconceived the availability of builder's risk coverage for an occupied building. Builder's risk insurance is not limited to unoccupied structures. Consent of the insurer and a "proper rate adjustment" would enable a builder to maintain insurance on even a fully occupied building, provided it was "in the course of construction."

Occupancy by the Board would not relieve contractors of the obligation to maintain builder's risk insurance for the life of their contracts. Occupancy prior to acceptance was clearly within the contemplation of the parties and did not, in and of itself, constitute a breach of contract. Under section 1.37 of the Special Conditions, the parties provided for pre-completion occupation after the stipulated completion date. Such occupancy did not constitute acceptance of any part of the project; nor did it entitle its builders to additional time or compensation for any

resulting inconvenience.[8]   To maintain its insurance, each contractor was obliged to seek the consent of its insurer and pay whatever higher premiums its insurer charged.   Contrary to the holding of the trial court, while occupancy may make builder's risk coverage more expensive, it does not make it unavailable.

## Conclusion

Fore the reasons set forth above, we conclude that Hartford, as subrogee, may recover on its claims that contractors' failure to repair fire damage constituted a breach of their contracts with the Board.   We hold that, irrespective of their obligation to maintain builder's risk insurance, the risk of loss was on defendant contractors at the time of the fire.   We further hold that defendant sureties may be held liable should the contractors fail to satisfy plaintiff's claims.

We also conclude that a remand is necessary to determine the amount and proper apportionment of the damage liability, and to permit the sureties to assert any remaining defenses.

Accordingly, the judgment of the Appellate Division is affirmed.

SULLIVAN, J. (dissenting).

I would reverse the judgment of the Appellate Division and reinstate the ruling of the trial court in favor of defendants. This is a case where for all practical purposes the building had been completed and the Board of Education had taken posses-

---

[8]Under section 57 of the General Conditions, the Board was required to obtain consent of the contractors, their sureties or their insurance carriers prior to such occupancy, unless the architect or engineer was of the opinion that the builders were chargeable with unwarranted delay.   The Board's undisputed failure to obtain the consent required by the construction contract, even if wrongful, did not render builder's risk insurance unavailable to the contractors.

sion. The fire happened on August 9, 1974. Since early June, the Board had provided for twenty-four hour guard duty for the building. By that time the Director of the school, two guidance counsellors, one teacher and a clerk were on the premises, all engaged in their respective professional and clerical responsibilities. Commencing on or about June 9 the building was used to interview between 50 and 100 students on a daily basis. As of August 8 some 16 persons had been assigned to the building by the Board, including five teachers who were making preparations for the school year commencing in September. The entire first floor of the building was occupied by Board employees as was the library area on the second floor. Portions of the third floor were being used to store cartons of supplies and furniture belonging to the Board.

At this point the Board, recognizing that it had taken possession of the building, arranged for fire insurance and extended coverage by Hartford. On Friday, August 9, in mid-afternoon, while Board employees were occupying the building in the manner heretofore described, the fire started among some of the Board's cartons stored on the third floor.

Such occupancy of the building by the owner created risks unrelated to construction for which the builders should not be held responsible. Hundreds of people had been using the building for Board purposes. In this situation, as the trial court found, the risk of loss had passed from the builders to the Board. The latter had recognized this by providing for its own insurance coverage. Indeed, although the cause of the fire was never determined, the stipulated facts show that the fire started among stored cartons belonging to the Board at a time when Board personnel were present in the premises. Absent a showing that one of the few construction employees in the building had caused the fire, the risk was that of the Board and was covered by the Hartford policy.

The present suit by Hartford is nothing more than an attempt to shift the risk, which it underwrote, to the builders and their insurers on the ground that there had not been a "formal" acceptance of the project by the owner despite its almost complete occupancy prior to the fire.

I would reverse the Appellate Division and reinstate the judgment of the trial court. Justice CLIFFORD joins in this dissent.

*For affirmance* —Chief Justice WILENTZ and Justices PASHMAN, SCHREIBER, HANDLER and POLLOCK—5.

*For reversal and reinstatement* —Justices SULLIVAN and CLIFFORD—2.