TOWNSHIP OF BERKELEY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. REPUBLIC INSURANCE COMPANY, A TEXAS CORPORATION AND MEYER GOLD, DEFENDANTS-APPELLANTS, AND JACOB BURSTYN, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued October 3, 1983—Decided October 21, 1983.

408

Before Judges ARD, MORTON I. GREENBERG and TRAUTWEIN.

*David Schechner* argued the cause for appellants (*Schechner & Targan,* attorneys; *Murray J. Laulicht, Robert G. Rose* and *Charles Quinn,* of counsel and on the brief).

*John S. Pehlivanian* argued the cause for respondent (*Lomell, Muccifori, Adler, Revaschiere & Amabile,* attorneys).

The opinion of the court was delivered by

MORTON I. GREENBERG, J.A.D.

For the second time this matter is before this court on appeal. The litigation arises from the failure of Cedar Ridge Corp. (hereinafter called "Cedar Ridge") and its successor in interest, Prel Middle Atlantic, Inc. (hereinafter called "PMA") to satisfy the conditions of three performance bonds posted by Cedar Ridge with plaintiff Township of Berkeley (hereinafter called "Berkeley") pursuant to Berkeley's subdivision ordinance. An understanding of the issues requires that the protracted proceedings be set forth at some length.

In 1970 Cedar Ridge, a corporation in which Meyer Gold and Jacob Burstyn were stockholders, was engaged in the development of a project in Berkeley called Berkeley Pines. Berkeley, on May 22, 1970, enacted ordinance no. 319, a subdivision ordinance, in accordance with *N.J.S.A.* 40:55–1.1 *et seq.*[1] On August 14, 1970 ordinance no. 319 was amended by ordinance no. 326. The amended subdivision ordinance required a developer to install certain improvements to obtain approval of major subdivisions. In lieu of actual installation of the improvements, the ordinance permitted the subdivider to file a performance bond and cash deposit totaling 110% of the estimated cost of the improvements or uncompleted portions thereof. The ordinance further provided that the township engineer determine the amount of the guarantee. In accordance with the ordinance, the engineer prepared estimates for the bonds and deposits on the Berkeley Pines project.

Cedar Ridge obtained three bonds dated September 24, 1970 from defendant Republic Insurance Company (hereinafter called "Republic") to satisfy the subdivision ordinance. These bonds together with a cash deposit were delivered to Berkeley. Each bond stated that Cedar Ridge was the principal, Gold and Burstyn were co-principals and Republic was surety. Bond numbered 905792 for $118,440.46 covered improvements in sec-

---

[1]Repealed by *L.* 1975, *c.* 291, § 80.

tions D and F of the subdivision. It specified that it was for acceptance by Berkeley in lieu of the principal doing the construction work "As per attached Estimate." The attached estimate showed numerous items of work to be done with a unit price breakdown for them. Bond numbered 905794 for $185,-658.71 covered improvements in section H of the subdivision. The bond was for acceptance by Berkeley in lieu of the principal doing the construction work on "items shown in attached Bond Estimate excluding monuments, street signs, shade trees, seeding, and debris clean-up." The attached estimate was similar in form to that attached to bond numbered 905792. The third bond, numbered 905795, for $27,000 also covered improvements in section H of the subdivision. This bond recited that it was for acceptance by plaintiff in lieu of the principal doing the construction work on "Concrete Monuments 39 UNITS[,] Street Signs 14 UNITS[,] Shade Trees 330[,] Seeding 119 LOTS[,] [and] Debris-Clean Up LUMP SUM[,]," the items excluded from bond 905794. There were two bonds on section H, inasmuch as Republic had a policy limiting performance bonds to $200,000 and the estimated cost of improvements in section H exceeded $200,000. Even though the body of bond numbered 905795 made no reference to it, an estimate was attached giving a unit breakdown price for the items mentioned.

The three bonds did not specify that the net obligation in each would be apportioned among the various improvements set forth in the attached estimates. Rather, all included the following provision:

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH that if the Principal shall, during the term of twenty four (24) months from the date hereof well and truly make and complete said improvements, in accordance with all of the requirements and specifications of the Township of Berkeley, and to the satisfaction of the Township Engineer, then this obligation to be void; otherwise to remain in full force and effect.

On November 30, 1970, following delivery of the bonds and cash deposit, Berkeley granted final approval of Cedar Ridge's subdivision plan for Berkeley Pines. Within the 24 months after execution of the bonds, many of the improvements were

installed. Berkeley, however, did not, in whole or in part, release any of the parties from the obligation of the bonds. Subsequently, Prel Corporation purchased Cedar Ridge's assets. A subsidiary of Prel, PMA, assumed Cedar Ridge's liability on the bonds. In November 1972, after the period for performance specified in the bonds had expired, Berkeley obtained an engineering report showing various deficiencies in the bonded work. Nevertheless, Berkeley did not then take action on the bonds.

On July 21, 1975 PMA filed a petition for reorganization in bankruptcy in the United States District Court for the Southern District of New York. In early 1976 an inspection report on behalf of Berkeley showed that the conditions of the bonds had not yet been satisfied. Thus on April 28, 1976 Berkeley instituted this action in the Superior Court, Law Division, against Republic, Gold and Burstyn to recover on the bonds. Neither Cedar Ridge nor PMA was made a defendant in the Superior Court action.

On April 16, 1976 PMA moved in the bankruptcy court proceedings to reject the bonds as executory contracts and on June 28, 1976 PMA instituted a proceeding in the bankruptcy court against Berkeley to compel it to issue building permits on another PMA project in Berkeley. The merits of these applications were never adjudicated in the bankruptcy court. After Berkeley had issued PMA four building permits, PMA and Berkeley on September 30, 1976 agreed in principle to a settlement requiring PMA to do certain specified work in Berkeley Pines. The record in the bankruptcy court presented on this appeal as to what transpired following this settlement is not entirely clear. It does show that the hearing on PMA's application was repeatedly adjourned. What it does not show is any agreement between Berkeley and PMA discharging PMA from the bonds or modifying its obligation thereon in any way. Quite to the contrary, as demonstrated by the settlement, Berkeley was attempting to cause PMA to complete the bonded work.

In the Superior Court action Berkeley filed a motion for partial summary judgment and on April 7, 1977 obtained an order for partial summary judgment against all three defendants. We granted leave to appeal from that order and on May 2, 1979 reversed, holding in an unreported opinion there was a dispute as to material facts. We further held that defendants should have been given an opportunity to complete discovery. Thus we remanded the matter to the Superior Court, Law Division, for further proceedings.

This case came on for trial after the remand in March 1982. Following the opening statements but prior to testimony being taken, Burstyn settled by agreeing to pay Berkeley $20,000 in satisfaction of a claim not germane to this appeal and by further agreeing to pay it one-half of any judgment entered against Gold and Republic as a result of the trial. The case was then tried to the court without a jury. The judge, after determining that Gold and Republic had no defenses to the action, made findings as to the costs of installing uncompleted improvements and making necessary repairs. Ultimately, on July 12, 1982, a judgment was entered for these items in the amount of $107,615.30 against Gold and $215,230.60 against Republic. The calculations gave Gold but not Republic credit for the Burstyn settlement.[2] The costs reflected in the judgment exceeded those anticipated in the engineer's estimates attached to the bonds. Nevertheless, since some items had been completed the judgment did not exceed defendants' total bond obligations. Gold and Republic have appealed from that judgment.

On this appeal Gold and Republic contend that each was a surety on the bonds. They further assert the agreement between PMA and Berkeley in the bankruptcy action and Berkeley's subsequent failure to enforce this agreement released

[2]There are other provisions in the judgment not significant to this appeal. The mathematics of the judgment are not questioned on the appeal.

PMA from liability, thus releasing them. Finally they maintain that, in any event, their liability for any particular item is limited to the estimate attached to the bond for it. Thus, in effect, they contend that the bonds have been discharged *pro tanto* as to any item shown on the estimates properly completed.

■ *Prima facie* there is no basis to hold that Gold was only a surety on the bond. On all three bonds he is named as a "Co-principal." This characterization could not have been inadvertent inasmuch as on all three bonds Republic is called the "Surety" and Cedar Ridge is specified as "Principal." If the parties to the bonds intended Gold to be only a surety, it is impossible to understand why he was not so described. While Gold's designation as a co-principal does not foreclose a finding that he signed the bonds in another capacity, *see Newark Finance Corp. v. Acocella,* 115 *N.J.L.* 388, 391 (Sup.Ct.1935), it is rebuttably presumed that a person so designated is in fact a principal. *See Slatoff v. Theurich,* 125 *N.J.Eq.* 555, 557 (E. & A. 1939).

Gold makes several contentions as to why he should not be treated as a principal. He urges that the subdivision ordinance required only the subdivider to be named as a principal on the performance bond, the township never requested him to sign as a principal, and he signed as a principal at the request of Republic. He further maintains that the form of the bonds is such that he was a surety therein. Finally he asserts that Berkeley treated Cedar Ridge and then PMA but not him as the principal.

■ We deal with these contentions *seriatim.* Until the amendment of the ordinance on August 14, 1970, any performance guarantee in lieu of installation of improvements was to be in cash or certified check. The amendment specified that the guarantee was to be combined in a performance bond and cash deposit. Cedar Ridge posted bonds and supplied cash in accordance with the amendment. While it might be expected that the

subdivider, Cedar Ridge, would be a principal on the bond, the amended ordinance did not so require nor did it preclude another person from being a principal. Thus treatment of Gold as a principal is not inconsistent with the ordinance. We fail to see how Gold's assertion that he signed the bonds as a co-principal at the insistence of Republic rather than Berkeley assists him. Indeed such demand emphasizes that his designation as a co-principal was intentional. By requiring Gold to be a co-principal, Republic, quite aside from any indemnification agreement it may have had with Gold, could, as a matter of law, have obtained exoneration from him for liability on the bonds. *D'Ippolito v. Castoro*, 51 *N.J.* 584, 591 (1968).

We see nothing in the form of the bonds that lends credence to Gold's contention that he signed as surety. Quite to the contrary all three bonds contain language explaining why Gold and Burstyn signed as principals. They recite that "the Co-Principals have a beneficial interest in said project." It is not surprising that since Gold had an interest in the project he signed as principal. Finally we see no significance in the fact that Berkeley dealt primarily with Cedar Ridge and then PMA concerning the Berkeley Pines project. It is to be expected that Berkeley would deal with the subdivider about the project. Such communications are in no way inconsistent with the treatment of Gold as a co-principal on the bonds. In sum, we find that Gold was a co-principal on all three bonds.

Though we do not doubt that the release of a principal from his obligation on a bond without the consent of the surety will discharge the surety, *see Slatoff v. Theurich*, 123 *N.J.Eq.* 593, 595 (E. & A. 1938); *Sholes v. Eisner*, 90 *N.J.L.* 151, 157 (E. & A. 1917); *State v. Weissenburger*, 189 *N.J.Super.* 172, 176 (App.Div.1983), we see nothing in the bankruptcy proceedings and Berkeley's subsequent actions that discharged Republic

from liability.[3]  We reach this conclusion for the fundamental reason that nothing in those proceedings released or modified PMA's obligations under the bonds.  Indeed the opposite is true.  Clearly, in the bankruptcy court, Berkeley was attempting to enforce its rights under the bonds.  Indeed, it obtained an agreement from PMA to complete certain improvements.

Defendants' final contention is the point we find to be most substantial.  In each instance the bonds supplied to Berkeley were written in a lump-sum amount calculated on the basis of an engineer's estimates annexed to the bonds.  The estimates show the anticipated cost of each item.  Inasmuch as the costs were established prior to the execution of the bonds on September 24, 1970, it is not surprising that the costs, as proved at the trial almost eight years later, were much greater than the costs previously anticipated.  Defendants contend that notwithstanding the lump-sum figure in the bonds their liability for any particular item should be limited to the cost of that item as it appeared in the engineer's estimate.  Defendants, in making this contention, rely on the parties' intent at the time of the delivery of the bonds and construction of the statutes authorizing the bonds.  Defendants argue that by attaching the engineer's estimates to the bonds the parties made the estimates part of the bonds.  Berkeley contends, and the trial court held, that the total sum of each bond is available for any of the items not completed covered by that bond.

It cannot be denied that a reasonable argument may be made that the extent of defendants' liability as determined by the trial court was dependent on what appears to be a random consideration: the number of bonds executed.  In theory defendants might have tendered any number of bonds to bond fully the project.  If that had happened, the guarantee under a bond for improvements completed would not have been avail-

---

[3]Gold does not argue that if he is a co-principal he was discharged by the bankruptcy proceedings.  Of course in this case there is no suggestion that Berkeley released collateral.  *See Langeveld v. L.R.Z.H. Corp.*, 74 *N.J.* 45 (1977).

able to satisfy Berkeley's claims on other bonds. In this case three bonds were executed because one bond was for a particular area of the development and the total amount for improvements in another portion exceeded $200,000. Republic's policy not to issue a bond in excess of that amount required that two bonds be written for the section where the estimated cost of improvements exceeded $200,000. If Republic had had a lower limit, perhaps more bonds would have been required.

■ Nevertheless, we are constrained to reject defendants' contentions. Initially, nothing in any of the bonds specifically breaks down the total sum and assigns portions thereof to any part of the improvements. Quite to the contrary, each bond was written for a lump-sum amount and was subject to the condition that the bond would be void if the requirements and obligations of Berkeley were fully satisfied. The bond was otherwise to remain "in full force and effect." By its plain terms, therefore, the bond was not to be reduced *pro tanto* or otherwise so long as any portion of the improvements guaranteed by the bonds remained to be completed.

Second, defendants could have tendered bonds to Berkeley providing for the limited liability which they now urge upon this court. We do not know whether such bonds would have been accepted by Berkeley and approved by its attorney as required by the subdivision ordinance. Thus, even though a contract of suretyship is to be strictly construed in favor of the surety, we see no reason in this case to depart from the clear language of the bonds. *See Hartford Fire Ins. Co. v. Riefolo Constr. Co.*, 81 *N.J.* 514, 525–526 (1980).

The result we reach is supported by the statutes at the time of the delivery of the bonds. At that time the Municipal Planning Act (1953), *N.J.S.A.* 40:55–1.22, provided in part:

The governing body may accept adequate performance guarantees for the purpose of assuring improvements, as provided in section 21 of this act and section 10 of the Official Map and Building Permit Act (1953).

The amount of any performance guarantee may be reduced by the governing body by resolution when portions of the improvements have been completed,

and the time allowed for installation of the improvements for which the performance guarantee has been provided may be extended by said body by resolution.

If the required improvements shall not have been installed in accordance with the performance guarantee, the obligor and surety, if any, shall be liable thereon to the municipality for the reasonable cost of the improvements not installed and upon the receipt of the proceeds thereof the municipality shall install such improvements.

When all of the necessary and appropriate improvements have been completed the obligor shall notify the municipal governing body, in writing, by certified or registered mail, of the completion of the aforesaid improvements and shall send a copy thereof to the municipal engineer. The municipal governing body shall direct and authorize the municipal engineer to inspect all of the aforesaid improvements. The municipal engineer shall, thereupon, file a report, in writing, with the municipal governing body, which report shall be detailed and shall indicate either approval, partial approval, or rejection. If said improvements, or any portion thereof, shall not be approved or shall be rejected by the municipal engineer, said report shall contain a statement of reasons for such nonapproval or rejection. Where said report indicates partial approval of said improvements, it shall indicate the cost of the improvements for which approval is rejected or withheld.

The municipal governing body shall accept or reject the improvements, grant partial approval, or withhold approval, on the basis of such report and shall notify the obligor in writing by certified or registered mail, of the contents of said report and the action of said municipal governing body with relation thereto not later than 180 days after receipt of the notice from the obligor of the completion of the improvements. Where partial approval is granted, the obligor shall be released from all liability pursuant to its performance guaranty bond, except for that portion adequately sufficient to secure the improvements not yet approved.[4]

The statute provided that the performance guarantees could be reduced by the governing body by resolution when portions of the improvements had been completed. In this case no such resolution was ever adopted. Thus there was no partial approv-

[4]The Municipal Planning Act (1953) was repealed by the Municipal Land Use Law effective August 1, 1976. *See N.J.S.A.* 40:55D-1 *et seq.* However, the repealed act governs this case inasmuch as the ordinance was in effect pursuant to the authority of the repealed act and the subdivision plans and bonds were delivered in 1970. *See Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.,* 80 *N.J.* 6, 52–54 (1976), app. dism. and *cert.* den. *sub nom. Feldman v. Weymouth Tp.,* 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977). *N.J.S.A.* 40:55D–53 now contains provisions similar to those of *N.J.S.A.* 40:55–1.-22.

al of the improvements. The construction contended by defendants in effect would provide for automatic reduction of the bond. We see no basis to permit this result. Certainly it is the policy of the law to protect municipalities from the inappropriate discharge of parties executing improvement bonds. *Barnegat Tp. v. DCA of New Jersey, Inc.*, 181 *N.J.Super.* 394 (App.Div.1981), certif. den. 89 *N.J.* 404 (1982).

In view of the aforesaid, the order for judgment of July 14, 1982 is affirmed.