**DOME PETROLEUM LIMITED, a corporation of Canada, and Dome Energy Limited, a corporation of Canada, Plaintiffs,**

**v.**

**EMPLOYERS MUTUAL LIABILITY INSURANCE CO. OF WISCONSIN, a mutual insurance company of Wisconsin, Frank Mulvey, Anthony Rotella, Teresa Helen Ernst and the First Jersey National Bank, a national bank with its principal office in New Jersey, Defendants.**

Civ. A. No. 84–97.

United States District Court,
D. New Jersey.

Nov. 7, 1991.

As Amended Dec. 2, 1991.

Morrill J. Cole, Cole, Schotz, Bernstein, Miesel & Forman, Hackensack, N.J., for plaintiffs.

Joseph J. Fleischman, Hannoch Weisman, Roseland, N.J., for defendants.

## OPINION

WOLIN, District Judge.

The parties have cross-moved for summary judgment. For the reasons set forth herein, defendants' motion is granted and plaintiffs' motion is denied.

## I. BACKGROUND

The factual basis of this case is set forth in detail in *First Jersey Nat'l Bank v. Dome Petroleum Ltd.*, 723 F.2d 335 (3d Cir.1983) (*"Dome I"*), and in *Dome Petroleum Ltd. v. Employers Mutual Ins. Co. of Wisconsin*, 767 F.2d 43 (3d Cir.1985) (*"Dome II"*). The Court will rely on and refer to the statements of facts in those opinions rather than repeat them here. The procedural posture of this case is, however, relevant to the legal issues that remain.

In *Dome I*, the Third Circuit held that the Depositary Agreement required Dome Petroleum Limited and Dome Energy Limited (collectively, "Dome") to indemnify The First Jersey National Bank ("First Jersey") for the $3.5 million loss that the State Street Group suffered and that First Jersey made good. 723 F.2d at 341–42. However, the Depositary Agreement gave Dome a right of subrogation. *Id.* at 343. Therefore, the court stated, "[i]t is at least arguable that the parties intended Dome to indemnify First Jersey only against losses not covered by First Jersey's insurance pol-

icy." *Id.* The effect of the subrogation clause was left unresolved in *Dome I. Id.*

After *Dome I,* Dome paid the judgment with interest and then sought subrogation from First Jersey's insurer, Employers Mutual Liability Insurance Company ("Employers"), under First Jersey's errors and omissions policy. *Dome II,* 767 F.2d at 44. Dome also asserted a claim against First Jersey for interference with Dome's subrogation rights. *Id.* at 45. These claims appeared as Counts I and IV, respectively, of Dome's complaint, and are at issue in the present cross-motions. Judge Stern of this Court granted summary judgment on defendants' behalf on both of these claims on the ground that Dome assumed ultimate liability for First Jersey's loss under the terms of the Depositary Agreement. The Third Circuit reversed and remanded.[1] It held that the subrogation clause in the Depositary Agreement manifested Dome's intent to assume the ultimate risk of loss "only in the event that there is no third party that might be liable to First Jersey." *Id.* at 47.

■ The Third Circuit's *Dome II* opinion furnishes a measure of direction to this Court on remand. The Court of Appeals stated that either the operation of law or the agreement of the parties could allocate the ultimate responsibility for the risk of loss. 767 F.2d at 46. There is no mandatory public policy that requires the risk of loss to fall on a contractual indemnitor rather than on an insurer. *Id.* (citing *A. & B. Auto Stores of Jones Street, Inc. v. City of Newark,* 59 N.J. 5, 279 A.2d 693 (1971); *Manzo v. City of Plainfield,* 59 N.J. 30, 279 A.2d 706, 708 (1971)). Cases holding that responsibility falls on the contractual indemnitor depend on operation of contract and not on public policy. *Id.* (citing *Bater v. Cleaver,* 114 N.J.L. 346, 176 A. 889 (1935)). The court remanded for a construction of the Employers insurance policy to determine whether Employers assumed the ultimate risk of loss. *Id.* at 47.

In the event that Employers and Dome intended to shift the risk to each other, the district court should look to suppletive rules of law to determine who the ultimate risk-bearer should be. Finally, even if Dome may be subrogated to First Jersey's claim against Employers, Employers may have substantive defenses under its policy or equitable defenses against Dome. We hold only that Dome did not bear the ultimate risk of loss by virtue of mandatory public policy or solely because of its agreement to indemnify First Jersey.

*Id.* at 47–48. The Court of Appeals also remanded Count IV, Dome's claim that First Jersey interfered with its subrogation rights. *Id.* at 48.

On remand, defendants again moved for summary judgment. They raised the following arguments that Dome, instead of Employers, assumed the risk: first, that Employers promised to indemnify First Jersey for "loss," and First Jersey never would have suffered a loss had Dome honored its obligation to indemnify First Jersey; second, that the subrogation clauses in the Depositary Agreement and the Policy cancel each other out and that therefore the loss should remain with Dome; third, that the Policy's "other insurance" clause encompasses Dome's obligation to indemnify; fourth, that Dome's indemnity should be treated as primary insurance and the Policy as excess insurance; fifth, that the indemnity was unlimited in coverage, whereas the Policy was limited to $5 million; sixth, that a contractual indemnitor should bear the risk instead of an insurer; and seventh, that a different indemnification provision, ¶ 12.7 of the Depositary Agreement, covers First Jersey's error and does not contain a subrogation clause. Judge Stern briefly rejected each of these arguments in a published opinion, 635 F.Supp. 1397, 1399–1401 (D.N.J.1986). Judge Stern likewise disposed of Employers' defenses, *i.e.,* that Dome was time-barred from bringing suit against defendants and that Dome acted inequitably by

---

1. The Third Circuit affirmed Judge Stern's grant of summary judgment on defendants' behalf on

two other counts not at issue here.

initially refusing to cover First Jersey's mistake and then by litigating the applicability of the indemnity. *Id.* at 1401. Finally, Judge Stern refused to dismiss plaintiffs' derivative claim of interference with subrogation rights. *Id.* at 1401–02. After Judge Stern issued his opinion, the parties pursued discovery, which is now complete.

## II. DISCUSSION

This Court approaches the issue before it constrained by the Third Circuit's teachings in *Dome II* and cognizant of Judge Stern's application of those teachings on remand. Absent unusual circumstances, once an issue is decided, it is law of the case and will not be relitigated. *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir. 1982). Among the circumstances in which relitigation of an issue is permissible is when the previous decision is "clearly erroneous and would work a manifest injustice." *Schultz v. Onan Corp.*, 737 F.2d 339, 345 (3d Cir.1984) (quoting *California v. Arizona*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983)). In his 1985 opinion, Judge Stern made a series of rulings on many of the sophisticated questions of law presented by this case. Judge Stern disposed of all of them with only the briefest of discussion. With respect to several of these rulings—they will be addressed as they arise—the Court is left with the firm conviction that they are incorrect either as a matter of substantive law or as a matter of interpretation of the scope of the remand ordered in *Dome II.* The Court will correct these errors but will leave undisturbed the balance of Judge Stern's rulings.

Although I am reluctant to review the rulings of the distinguished judge who preceded me on this case, the procedural posture of this case compels me to do so. Defendants have not advanced any grounds for summary judgment other than those rejected by Judge Stern. If I did not reconsider defendants' arguments, I would be constrained to rule for Dome. I do not consider the mandate of the *Dome II* remand to require this result. The grounds on which Dome argues it should be granted summary judgment—none of which were before Judge Stern—are appreciably weaker than defendants' arguments. Thus, the determination of this case requires a comparison of the competing theories advanced by the parties. Such a comparison requires that all the cards be on the table, which, at long last, they are. Finally, in order to attempt to avoid yet another remand, I have considered all of the arguments advanced as to liability. Because I will grant summary judgment to defendants, I have not, however, considered the issue of prejudgment interest.

## A. *Dome's Proposed Mandatory Rule*

Dome argues that the approach handed down by the Third Circuit leads to a holding that, as a mandatory rule, an insurer bears the ultimate risk because it charges premiums to offset that risk. Opening Brief at 27–28. In support of the premise that this Court should concern itself with mandatory rules, Dome quotes the following language from *Dome II:* "In this case, we examine first whether there are any mandatory rules of risk allocation, and if there are not, what the parties intended. If that intent is unclear or conflicting, then the court will apply suppletive rules to allocate the risk." 767 F.2d at 46 n. 2, *quoted in* Dome's Opening Brief at 27. Dome also points out that while the Third Circuit expressly ruled out mandatory allocation of risk to Dome, *Dome II*, 767 F.2d at 46, it did not do so as to Employers. Dome's Reply Brief at 3.

The Third Circuit, albeit implicitly, did foreclose a holding that mandatory rules of public policy allocate the risk to Employers. This holding is implicit in the passage quoted above by Dome: if a mandatory rule allocated the risk to Employers, then remand for the purpose of discerning Employers' intent would have been unnecessary; the Third Circuit would have simply applied that rule. Instead, the Third Circuit directed this Court to consider Employers' policy to analyze its intent and then, in the event that Employers sought to shift its responsibility to Dome, to apply suppletive rules. *Id.* at 47. Thus, the Third Circuit's statement that *"we* examine first

whether there are any mandatory rules of risk allocation," *id.* at 46 n. 2 (emphasis added), is directed to itself and not to this Court.

■ The rule Dome proposes—that an insurer must cover a loss even if the insured has a collateral remedy—is inapposite here. The rule derives from a line of fire insurance cases in which the insured was permitted to recover insurance on the destroyed property even though a third party also compensated the insured for the property under a separate transaction. *E.g., P.R. De Bellis Enterprises, Inc. v. Lumbermen's Mutual Casualty Co.,* 77 N.J. 428, 437, 390 A.2d 1171 (1978) (insured had a right to insurance proceeds as well as tax redemption); *Wolf v. Home Ins. Co.,* 100 N.J.Super. 27, 49, 241 A.2d 28 (L.Div.), *aff'd per curiam,* 103 N.J.Super. 357, 247 A.2d 345 (App.Div.1968) (insurance coverage as well as purchase price of property); *Board of Trustees of First Congregational Church v. Cream City Mutual Ins. Co.,* 255 Minn. 347, 96 N.W.2d 690, 696 (1959) (same); *Alexandra Restaurant, Inc. v. New Hampshire Ins. Co.,* 272 App.Div. 346, 71 N.Y.S.2d 515, 522 (1947), *aff'd,* 297 N.Y. 858, 79 N.E.2d 268 (1948) (right to insurance proceeds even though landlord, under the lease, had rebuilt destroyed property). The rationale of these cases is that the insurer charges premiums to offset a risk of loss without knowledge of the existence of any collateral remedy. *Wolf,* 100 N.J.Super. at 49, 241 A.2d 28; *Board of Trustees,* 96 N.W.2d at 696. To deny recovery to the insured would create a windfall for the insurer and ignore the reasonable expectations of the insurer and the insured. *De Bellis,* 77 N.J. at 437–38, 390 A.2d 1171; *Board of Trustees,* 96 N.W.2d at 696.

Dome urges that this line of fire insurance cases is especially applicable here, where there is no danger of double recovery if the insurer is held to bear the risk. Opening Brief at 35. One of the arguments against holding the insurer liable in the event of a collateral recovery is that the insured would profit from the insur-

ance. *Board of Trustees,* 96 N.W.2d at 696; *Wolf,* 100 N.J.Super. at 46, 241 A.2d 28. Because that countervailing argument is not present in this case, Dome contends, the holding of the fire insurance cases is especially appropriate here.

The lack of potential for double recovery here illustrates that this line of fire insurance cases is distinguishable from this case. The fire insurance cases proceed on the assumption that the collateral obligors will be liable on their obligations. *See De Bellis,* 77 N.J. at 437, 390 A.2d 1171 (tax redemption had already occurred); *Wolf,* 100 N.J.Super. at 32–33, 241 A.2d 28 (insured received full purchase price); *Board of Trustees,* 96 N.W.2d at 695, 697 (court assumed that insured would receive balance of contract, which was not before it); *Alexandra Restaurant,* 71 N.Y.S.2d at 517 (landlord fully repaired improvements). Therefore, these cases cannot serve, as Dome asserts, to remove it, as the collateral obligor here, from its obligation. The issue here is whether Dome or Employers should bear the risk, not whether Employers, as well as Dome, should bear it. The teaching of the fire insurance cases provides no guidance here.

### B. *The Subrogation Clause in the Policy*

The proper point of departure on remand is the fact that the Policy contains a subrogation clause: "In the event of any payment under this Policy, the Company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights...." Exhibit B to Declaration of Joseph Fleischman ("Fleischman Declaration"), at 2008.[2]

The absence of a subrogation clause would have meant that Employers intended to assume the ultimate risk. *See Dome II,* 767 F.2d at 47 (in absence of subrogation clause in indemnity, Dome would have assumed ultimate risk). The broad language of the subrogation clause appears to cover

---

**2.** Unless otherwise indicated, numbers referring to exhibits are Bate stamp numbers.

this case. Dome does not deny that the Policy's subrogation clause expresses Employers' intent to be subrogated to First Jersey's rights.

Dome does advance the argument, however, that other terms in the Policy manifest Employers' intent to bear the ultimate risk of loss. Specifically, Dome points to the fact that Employers inquired in its application form whether First Jersey's trust agreements for ERISA accounts "include an indemnity provision to protect the Bank." Exhibit J to Certification of Morrill Cole ("Cole Cert.") at 3833. Employers also asked whether First Jersey had other insurance. *Id.* at 3801. Because the application did not ask whether a contractual indemnity clause protected First Jersey in its work as a depositary or as a transfer or paying agent, Dome argues, the terms of the Policy and the premiums charged reflect an indifference to such protection. Dome's Opening Brief at 38–39.[3]

The Third Circuit expressly rejected the parallel argument made by defendants in *Dome II.* Dome's subrogation clause encompassed "any claim which [First Jersey] may have against any third party with respect to any items reimbursed to [First Jersey] hereunder by [Dome]." 767 F.2d at 47 (citing Depositary Agreement ¶ 16.1; bracketed language added by Third Circuit). The undisputed fact that "Dome never inquired about insurance during the negotiation of the depository agreement or immediately after the loss was discovered" was held insufficient to bar Dome's subrogation claim. *Id.* Employers was held to

be a "third party" within the terms of the subrogation clause. *Id.*

Likewise, the terms of the Policy's subrogation clause are relevant here, not the lack of pre-contractual negotiations related to possible indemnification. The terms of the Policy's subrogation clause are triggered by "any payment" and may be asserted against "any person or organization." Those terms encompass Employers' claims against Dome following Employers' payment to First Jersey.[4] The Policy's subrogation clause manifests Employers' intent not to assume the ultimate risk of loss. *See Dome II* 767 F.2d at 47 (subrogation clause in Depositary Agreement reserved Dome's right to shift ultimate loss to third party liable to First Jersey; construction of the Policy may indicate that Employers also intended to shift ultimate loss to third party).

### C. *Indemnification for Liability Versus Indemnification for Loss*

Before looking to suppletive rules of risk allocation, the Court will address defendants' argument that Dome bears the ultimate risk of loss because it promised to indemnify against liability or loss[5] whereas Employers promised to indemnify solely against loss.[6] Defendants urge that because Dome had a duty to indemnify First Jersey for liability, First Jersey never should have incurred a loss, and therefore Employers never should have incurred an obligation to pay First Jersey; consequently, there was no loss to First Jersey such that Dome became subrogated to First Jer-

---

3. Although the Policy contains a clause that makes it embody "all agreements existing between the Insured and the Company," Exhibit B to Fleischman Declaration ¶ 12, the application is part of the Policy. *Id.* at 2019; Exhibit J to Cole Cert. at 3800, 3884.

4. Dome also argues that this subrogation clause is "ineffective as a matter of law" because insurers may not utilize subrogation clauses to shift their responsibility to contractual indemnitors. Dome's Opening Brief at 40 (citing the fire cases). This argument backslides into mandatory risk allocation; moreover, the Court has already found the fire cases inapposite.

5. Dome promised to indemnify First Jersey and hold it harmless "from any and all claims, ac-

tions, judgments, damages, losses, liabilities, costs and expenses...." Depositary Agreement, Exhibit A to Fleischman Declaration, ¶ 16.1.

6. The Policy required Employers "[t]o indemnify the Insured ... against loss ... by reason of liability imposed by law against the Insured, or by reason of liability assumed under an agreed settlement out of court with the consent of the Company." Policy, Exhibit B to Fleischman Declaration, at 2005. Employers was not obligated to make any payment under the Policy "for any loss until the Insured has paid such amount of any judgment, decree, or agreed settlement...." *Id.* at 2007.

sey's rights against Employers. Defendants' Opening Brief at 30.

At first glance, this argument appears to contradict *Dome II*, since it urges that Dome did not intend to shift ultimate responsibility for the risk of loss to Employers. *See* 767 F.2d at 47 (subrogation clause shows Dome's intent to shift ultimate responsibility to Employers). However, this theory depends on an interpretation of the terms of the Policy, which the Third Circuit did not have before it. *Id.* Thus, defendants properly raise the "no loss" theory on remand.

Judge Stern disposed of defendants' "no loss" argument by ruling that whether First Jersey suffered a loss is irrelevant because Dome suffered a loss by indemnifying First Jersey and therefore is subrogated to First Jersey's rights under the Policy. 635 F.Supp. at 1399. Judge Stern also observed that "[d]efendants make much of a distinction between insuring for loss and insuring for liability," 635 F.Supp. at 1399, but he never analyzed the distinction itself. *See id.*

Judge Stern's rejection of defendants' "no loss" argument, without more, is clearly erroneous. Fairness compels that it be revisited. If First Jersey suffered no loss, then Dome cannot be subrogated to First Jersey's right to indemnification for loss. *See, e.g., United States v. Munsey Trust Co.*, 332 U.S. 234, 242, 67 S.Ct. 1599, 1603, 91 L.Ed. 2022 (1947) ("one cannot acquire by subrogation what another whose rights he claims did not have"). *Accord Aetna Ins. Co. v. Gilchrist Bros., Inc.*, 85 N.J. 550, 561, 428 A.2d 1254 (1981), *partially overruled on other grounds, Wilson v. Unsatisfied Claim & Judgment Fund Board*, 109 N.J. 271, 280, 536 A.2d 752 (1988). Thus, if First Jersey had suffered no loss, Dome would not have any subrogation rights under the Policy.

 The critical issue, then, is whether Dome became obligated to cover First Jersey's liability to the State Street Group [7]

before Employers was obligated to pay First Jersey for its loss in reimbursement for First Jersey's payment to the State Street Group. If so, then Dome should have paid First Jersey or the State Street Group when Dome learned of First Jersey's liability and before First Jersey paid the State Street Group.[8] In that case, First Jersey would have satisfied its liability to the State Street Group without having ever suffered a loss. Because the Policy, to which Dome seeks to be subrogated, only provides for indemnification for loss, the lack of a loss to First Jersey would preclude Dome's subrogation claim.

Defendants' argument depends on whether First Jersey's right to indemnification under the Depositary Agreement was triggered before its right to indemnification under the Policy. There is a well-established difference between indemnification for loss and indemnification for liability:

> Under a contract of indemnity, it is necessary that the insured show that he has suffered damage or loss, as by actually paying the judgment fixing his liability, in order that he may have recourse to such policy. *But, where the policy is a contract for protection against liability, the insured may turn to it for relief as soon as his liability has become legally fixed and established,* although he has not suffered actual loss, as by being required to discharge such liability.

*Nakonieczny v. Commonwealth Casualty Co.*, 111 N.J.L. 137, 167 A. 213, 214 (1933) (emphasis added). *Accord Viddish v. Hartford Accident & Indemnity Co.*, 41 N.J.Super. 221, 225, 124 A.2d 607 (App.Div. 1956) (citing *Nakonieczny*). In this case, First Jersey's liability to the State Street Group was never legally established in the sense of having been adjudicated. On the other hand, Dome, upon learning of First Jersey's proration error, did not dispute First Jersey's error, although it denied its own responsibility. *See* June 12, 1981 let-

---

**7.** As in *Dome II*, the "State Street Group" refers to the State Street Bank and 17 other stock tenderors. 723 F.2d at 337–38.

**8.** If not, then Dome and Employers both became obligated to pay First Jersey at the same time, when First Jersey suffered a loss by paying the State Street Group.

ter of Lee Abrams to Herman Suenholz, Exhibit T to Fleischman Declaration. Dome is strangely silent as to when First Jersey's liability was established.

In assessing this matter, the Court has reviewed an Appellate Division case cited by neither of the parties, *Grippo v. Schrenell & Co.,* 223 N.J.Super. 154, 538 A.2d 404 (App.Div.1988). In *Grippo,* a subcontractor in a construction project agreed to indemnify the general contractor and the owner "against all liability, claims and judgements [sic] or demands for damages" that were caused by the subcontractor. 223 N.J.Super at 157, 538 A.2d 404. The subcontractor also agreed to defend any suit brought against the owner and the general contractor due to such an accident, and to reimburse them for any expenditure they might make by reason of such an accident. *Id.* An employee of a different subcontractor hurt himself at the construction site and then sued the indemnifying subcontractor, the general contractor, and the owner. *Id.* at 157–58, 538 A.2d 404. The general contractor then sought indemnification. *Id.* at 158, 538 A.2d 404. The trial court ruled that the subcontractor had to defend and indemnify the general contractor because plaintiff alleged that the subcontractor had created the hole. *Id.*

The Appellate Division reversed. It held, first, that the trial court's order requiring the subcontractor to defend and indemnify was improper where a factual dispute remained as to the subcontractor's liability. *Id.* at 165, 538 A.2d 404. Second, the court held that a "mere allegation" that the subcontractor caused the accident did not trigger the subcontractor's obligation to indemnify and defend. *Id.* The Appellate Division pointed out that the contract language quoted above should be construed against the general contractor because it was both the drafter of the contract and the indemnitee. *Id.* at 166, 538 A.2d 404. The Appellate Division stated further that an allega-

tion alone would have triggered the right to a defense only if the indemnification agreement had expressly so provided. *Id.*

The indemnification clause at issue in *Grippo* is similar to the indemnification clause in the Depositary Agreement: each clause promises to indemnify for liabilities, claims, and judgments; and each was drafted by the party seeking indemnification. In this case, however, there has never been any dispute as to First Jersey's liability. *See Dome I,* 723 F.2d at 343 ("Dome expressly declined to direct First Jersey's choice of a remedy.").[9] *Cf. Grippo,* 223 N.J.Super. at 165, 538 A.2d 404 (question of fact as to subcontractor's liability). Where the underlying liability is undisputed, as it was here, a rule requiring adjudication of liability as a prerequisite of indemnification for liability would serve no purpose. When the indemnitor acknowledges the indemnitee's liability, an adjudication of liability is unnecessary.

First Jersey paid the State Street Group on June 25, 1981. At that time, it incurred a loss reimbursable under the Policy. As to when liability arose, First Jersey received the shares tendered by the State Street Group on May 26, 1981, the last day that tender was timely. *Dome I,* 723 F.2d at 337–38. Instead of time-stamping the shares, as it should have done, First Jersey returned them to the State Street Group as untimely. *Id.* at 338. The State Street Bank informed First Jersey by telephone on June 8 or 9 that it had improperly rejected the tender as untimely. *Id.* Because First Jersey could not find a record of having received the shares, the State Street Bank mailed to First Jersey a copy of the Brink's receipt for the delivery of the shares on May 26. *Id.* First Jersey received the May 26 receipt from the State Street Bank on June 11, the day after it mailed out payment for the other timely shares. *Id.* First Jersey immediately informed Employers and Dome. *Id.* First

---

**9.** The other fundamental difference between *Grippo* and this case is that in *Grippo,* the alleged wrongdoer, the subcontractor, was the indemnitor; here, the acknowledged wrongdoer, First Jersey, is the indemnitee. In *Grippo,* therefore, the subcontractor's admission that its negligence had caused the plaintiff's injury would have constituted an admission of its duty to indemnify the general contractor and the owner. Such an admission did not occur in *Grippo.*

Jersey received little guidance from Dome in dealing with the problem. *Id.* at 343. First Jersey's counsel wrote Dome's counsel on June 16, 1981 that Dome had "failed to instruct us ... how to proceed pursuant to Dome's indemnification obligation under the Depositary Agreement between it and First Jersey...." June 16, 1981 Letter from Ellen Kulka to Robert Curley, Exhibit W to Fleischman Declaration. On June 25, 1981, First Jersey mailed its payment to the State Street Group and demanded indemnification from Dome. *Dome I,* 723 F.2d at 338. After Dome refused, First Jersey entered into the loan receipt agreement with Employers under which First Jersey was reimbursed for its payment to the State Street Group.

First Jersey's liability attached on June 10 when it first failed to pay the State Street Group. Dome became obligated to indemnify First Jersey soon thereafter, when First Jersey informed it of the situation and Dome did not dispute First Jersey's liability to the State Street Group. Because First Jersey demanded indemnification from Dome before June 25, Dome's obligation to pay First Jersey arose before First Jersey actually paid the State Street Group and therefore before Employers became obligated to reimburse First Jersey for the loss.

Without discussing the distinction between an indemnity for liability and one for loss, Dome relies on the fire insurance rule, discussed above, that an insurer may not rely on a collateral recovery by its insured to deny that the insured suffered a loss. Opposition Brief at 10 (citing *Wolf,* 100 N.J.Super. 27, 241 A.2d 28). In *Wolf,* a property owner insured its property and then entered into an agreement to sell it to the State of New Jersey Highway Department "in lieu of condemnation proceedings." 100 N.J.Super. at 30, 241 A.2d 28.) After the State took possession, a fire occurred; thereafter, the State paid the full contract price for the property. *Id.* The insurance policy permitted the property owner to recover "to the extent of the actual cash value at the time of the loss." *Id.* at 32, 241 A.2d 28.

The propriety of the insurer's refusal to pay turned on whether the "loss" suffered by an insured occurs as of the date of the fire, such that the insurer is obligated to pay at that time, or whether "subsequent collateral events" should be taken into account in determining the existence of an insurable loss. *Id.* at 32–33, 241 A.2d 28. In holding the former rule preferable, the *Wolf* court was persuaded in part by the requirement in the fire insurance policy to inform the insurer in writing within 60 days after the "loss." *Id.* at 45, 241 A.2d 28. If the fire itself was not the loss, then the insured could wait until collateral events occurred before informing the insurer of the loss. *Id.* at 45–46, 241 A.2d 28.

Similarly, in this case, the Policy provides that "for all purposes of the Policy," the date of the loss is the earlier of (a) First Jersey's written notice from any person claiming that First Jersey was liable for a covered act, error, or omission; or (b) First Jersey's discovery of such an act, error, or omission. Policy, Exhibit B to Fleischman Declaration, at 2006. First Jersey received written notice from the State Street Group as to its liability and determined that the tender was timely on the same day, June 11. *Dome I,* 723 F.2d at 338. This was the day after the checks went out to the other tenderers, and First Jersey immediately notified both Dome and Employers. *Id.* Thus, under the Policy, the loss was incurred on or about June 11, before Dome became obligated to pay under the indemnity. However, the date of the loss under the policy does not assist Dome in its pursuit of subrogation.

Although, as in *Wolf,* there is some uncertainty here as to when a loss occurred, there is no uncertainty that Employers' obligation to indemnify First Jersey occurred only when First Jersey had paid the State Street Group. *See* Policy at 2007 (Employers "not ... obligated to make any payment under this Policy until the Insured has paid such amount of judgment, decree or settlement"). Because Dome's obligation arose upon First Jersey's liability, Dome's satisfaction of that obligation would have extinguished First Jersey's liability without First Jersey ever having in-

curred a loss reimbursable by Employers. Dome's right to subrogation derives from First Jersey's primary right to payment by Employers for loss. Dome should have covered First Jersey's liability to the State Street Group and thereby foreclosed First Jersey's primary right, as well as Dome's right to subrogation. Although Dome failed to do so, it cannot benefit from that failure. Therefore, the Court will enter summary judgment on defendants' behalf.

## D. Suppletive Rules [10]

Even though, as a matter of the parties' intent, Dome had the primary obligation to bear the risk, the Court will address the various suppletive rules advocated by the parties.

### 1. Dome's Proposed Suppletive Rules

■ (a) *The riot cases.* Dome argues that because it was not paid for its indemnity, whereas Employers was paid for its insurance, Employers bears the ultimate risk of loss. Dome relies on two cases, *A. & B. Auto Stores of Jones Street, Inc. v. City of Newark*, 59 N.J. 5, 279 A.2d 693 (1971) and *Manzo v. City of Plainfield*, 59 N.J. 30, 279 A.2d 706 (1971), in which the Supreme Court of New Jersey considered whether the insurers of property destroyed in riots were subrogated to their insured's rights under a New Jersey statute that makes municipalities liable for such property. *A. & B. Auto Stores*, 59 N.J. at 13, 279 A.2d 693 (citing N.J.S.A. 2A:48-1 prior to 1968 amendment). The court framed the issue as follows:

> Thus the contest here is between a surety paid to absorb a riot loss and an involuntary surety, the taxpayers of the community, who received nothing for their assigned responsibility and who will not profit a penny if the loss remains with the carriers who contracted for that very liability.

*Id.* at 25, 279 A.2d 693. The court held that it would be unjust to permit the paid insurer to transfer its loss to the city. *Id.;* *Manzo*, 59 N.J. at 32–33, 279 A.2d 706

(following *A. & B. Auto Stores* ). Dome asserts that it is analogous to the city because it did not receive premiums. Opening Brief at 43. Moreover, it argues that "[t]he New Jersey courts have clearly extended the anti-windfall majority rule to non-governmental entities such as Dome." Reply at 5. For this proposition, Dome relies upon the fire insurance cases discussed above. *Id.* at 6, 279 A.2d 693.

The Third Circuit cited *A. & B. Auto Stores* and *Manzo* in *Dome II* to support the statement that "[i]n this case, there is no indication of any mandatory public policy that would require that the risk of loss fall on a contractual indemnitor as opposed to an insurer." 767 F.2d at 46. The court provided a parenthetical synopsis of the cases: "as between city and insurer, both of whom are liable to a property owner for losses, public policy places loss on insurer despite contractual reservation of subrogation rights." *Id.* The Court interprets this treatment of the riot cases to make the distinction that whereas they involve a rule of mandatory public policy, "[i]n this case" there is no such rule. *See id.* If the riot cases governed here, the Third Circuit would have applied them without having to remand for an inquiry into the Policy.

Moreover, the riot cases are simply inapposite. Unlike the cities, which a state statute made liable for property damage, Dome undertook its obligation voluntarily. Although Dome did not receive premiums, it cannot be considered "unpaid" in the same sense as the cities in the riot cases: the indemnity was a part of the bargain under which First Jersey agreed to act as depositary for Dome. Finally, the fire cases discussed above cannot be considered in any sense to expand the rule in the riot cases to voluntary indemnity situations. The fire cases assume double recovery by the insured, whereas the riot cases do not. Neither the riot cases nor the fire cases apply to the voluntary indemnity at issue here.

■ (b) *Splitting the loss.* Dome's fallback position is that, if the Court holds that

---

**10.** The Oxford English Dictionary defines "suppletive" as: "Having the attribute of supplying deficiencies." Oxford English Dictionary 203 (1980).

Dome and Employers both attempted to impose the ultimate risk on the other, they should have to split the loss equally. Opening Brief at 45–46 (citing *Cosmopolitan Mutual Ins. Co. v. Continental Casualty Co.*, 28 N.J. 554, 147 A.2d 529 (1959)). In *Cosmopolitan*, two automobile insurers had insured a risk under separate policies, each of which stated that it was to be considered excess insurance with respect to any other valid and collectible insurance. 28 N.J. at 556–57, 147 A.2d 529. The Supreme Court of New Jersey held that these mutually repugnant "other insurance" clauses canceled each other out, and it required the two insurers to share the loss. *Id.* at 562, 147 A.2d 529. A court should only apportion the loss between two insurers "when the insured interests are the same and the excess clauses are actually repugnant, *i.e.,* when both policies 'evidence the *same* intent with respect to insuring the risk and also with avoiding liability in the event of adequate coverage by another carrier.'" *Commercial Union Ins. Co. v. Bituminous Casualty Corp.*, 851 F.2d 98, 103 (3d Cir.1988) (quoting *Cosmopolitan*, 28 N.J. at 561, 147 A.2d 529; emphasis added by Third Circuit; other citation omitted). In this case, Dome and Employers did not express the same intent with respect to covering the risk: Dome promised to indemnify for liability, while Employers promised to indemnify for loss. The effect of this disparate intent, the effect of which has been discussed in detail above, renders *Cosmopolitan* inapposite.

*Cosmopolitan* is inapplicable for another reason: it deals with conflicting "other insurance" clauses, whereas this one deals with conflicting subrogation clauses. In this case, even if Dome and Employers had the same intent with respect to insuring the risk, suppletive rules may assign the risk. *Dome II*, 767 F.2d at 47. Although *Cosmopolitan* certainly provides a suppletive rule, that rule applies only if neither party should be treated as an excess insurer. The Court now turns to the suppletive rules proposed by Employers, all of which relate to the primary-excess issue.

### 2. *Defendants' Proposed Suppletive Rules*

[6] (a) *The "other insurance" clause.* Defendants propose several suppletive rules that leave Dome with the ultimate risk of loss. First, they argue that the "other insurance" clause in the Policy, contrasted with the lack of such a clause in the Depositary Agreement, manifests Employers' intent not to bear the ultimate risk of loss when there was another source of payment. Opening Brief at 45. This clause provides in relevant part: "This policy shall not apply to any loss covered by any other valid and collectible *insurance* available to the Insured or which would be available but for the existence of this insurance...." Policy at 2008 (emphasis added). Judge Stern rejected this argument on the ground that the "other insurance" clause refers only to insurance and not to indemnity agreements. 635 F.Supp. at 1400 (citing *American Nurses Ass'n v. Passaic General Hospital*, 98 N.J. 83, 90, 484 A.2d 670 (1984)). This holding, which is consistent with the terms of the Policy, will be left undisturbed.

(b) *Primary versus excess coverage.* Judge Stern also rejected defendants' argument that "because Dome's indemnification agreement applied to this specific transaction, while Employers' insurance was a policy for liability generally, Dome's indemnification should be treated as primary insurance and Employers' as excess insurance." 635 F.Supp. at 1400. The entire basis for this rejection was as follows: "As defendants cannot show that the indemnification agreement should be treated as insurance, the argument fails." *Id.*

I respectfully disagree with Judge Stern's rejection of this "general-specific" argument on the same grounds as the "other insurance" argument. The express terms of the "other insurance" clause make it inapplicable to Dome's indemnity. On the other hand, the fact that Employers provided insurance, while Dome provided a contractual indemnity, does not render irrelevant the principle—albeit an insurance principle—that the more specific coverage of a risk is treated as primary insurance,

whereas the more general coverage is treated as excess insurance. *See* 16 *Couch on Insurance* 2d § 62:59 at 504 (rev'd ed. 1983) (in some states, specific insurance treated as primary and blanket insurance treated as excess); 6 *Appleman, Insurance Law & Practice* § 3912 at 486 (1972) (blanket policies generally regarded as excess insurance over and above specific insurance). In *Cosmopolitan,* the Supreme Court of New Jersey observed that there are "cases which undertake to decide which policy's coverage is more specific, holding the one thought more specific to be primary." 28 N.J. at 560, 147 A.2d 529 (citations omitted). The court rejected the general-specific rule as arbitrary with respect to automobile liability insurance because it ignores the conflicting "other insurance" provisions of such policies. *Id.* (citation omitted). Moreover, in *Cosmopolitan,* the two policies were equally specific. *Id.* Thus, while the *Cosmopolitan* court did not endorse the rule, nor did it reject it in the absence of conflicting "other insurance" clauses.[11]

The Appellate Division applied the general-specific rule in *Pasker v. Harleysville Mutual Ins. Co.* to insurers that had subscribed to the Guiding Principles for Overlapping Insurance Coverage, a document that prescribes the rule. 192 N.J.Super. 133, 139–40, 469 A.2d 41 (1983), *criticized on other grounds in Dome II,* 767 F.2d at 45. Dome is not an insurer and is not governed by the Guiding Principles. Although the Appellate Division stated the general rule that blanket policies are treated as excess, *id.* 192 N.J.Super. at 140, 469 A.2d 41 (citing 6 *Appleman, Insurance Law & Practice* § 3912), that statement appears to be dictum.

The rule that general insurance should be treated as excess is not arbitrary in this case. I arrive at this conclusion by taking two small steps: first, the rule makes sense in the insurer-versus-insurer context; and second, it applies equally in this insurer-versus-indemnitor case. As to the first

step, an insured looks to its general insurance policy for coverage for a variety of mishaps; if this coverage is depleted because of a single mishap, then it may be left uninsured. However, if another insurance policy covers a more specific risk, and a mishap occurs within the scope of coverage, then the insured should be able to look to the specific coverage and retain its general coverage, as it were, for a rainy day. This principle permits the insured the maximum benefit of its bargain by affording the fullest coverage.

This principle makes sense in this case. As Dome has acknowledged,

> the Dome indemnification of First Jersey specifically applied to this particular 1981 Dome $1.43 billion tender offer for Conoco stock and to no other transaction, whereas the Employers policy was First Jersey's pre-existing trust operations surcharge liability policy, which with coverage of $5,000,000, was for all of First Jersey's personal trust and corporate trust operations.

Defendants' Interrogatories to Plaintiffs (First Set) with Requests for Admissions, Exhibit J to Fleischman Declaration, response to request for admission 32, at 40. Dome's admission illustrates the principle that the provider of risk-specific coverage should cover the risk. Here, the risk resulted in a $3.5 million liability. If First Jersey is compelled to look to Employers for coverage, then its insurance coverage was depleted to $1.5 million by its proration mistake. The potential effect of this depletion becomes clear if one contemplates the possibility of First Jersey suffering a contemporaneous mishap, unrelated to its role as Dome's depositary, and in excess of $1.5 million. In that event, First Jersey would have had no insurance to cover the excess amount.

On the other hand, a holding that First Jersey may look to Dome for coverage means that its total coverage remained intact. A tender offer-related mistake of any

---

**11.** This case does not involve a provision by the more specific insurer that any covered loss will be shared by it and any other insurer that covers the loss. *See Liberty Motor Freight Lines,* *Inc. v. United States Guarantee Corp.,* 133 N.J.L. 35, 38, 42 A.2d 394 (1945) (requiring contribution by general insurers).

dollar amount would have come within the indemnity, as its coverage was not limited to a dollar amount.[12] In the event of a contemporaneous, non-depositary-related mishap, First Jersey could look to Employers for up to $5 million in insurance coverage. Although the Court is unaware of any contemporaneous mishap in this case, the point of a general-specific rule is that it provides for coverage in the face of such contingencies and thus maximizes coverage.

■ The general-specific rule should apply even if the provider of more specific coverage is a contractual indemnitor rather than an insurer, because there is no less reason to permit the "insured" the benefit of both bargains. Dome's statement that "insurance principles do not apply to Dome's contractual indemnity obligation," Opposition at 13, directly conflicts with its argument that, as a last resort, *Cosmopolitan* requires splitting of the loss. If insurance principles are truly irrelevant, then *Cosmopolitan*, which split a loss between two insurers, has no bearing here.

The negotiating history of the Depositary Agreement supports Dome's ultimate liability. Dome characterized as "in effect, not negotiable" the following sentence in the Depositary Agreement ¶ 16.1: "This indemnity shall exclude only intentional and deliberate misconduct on your [First Jersey's] part." Defendants' Request to Admit, *Dome I*, Exhibit A to Answering Declaration of Joseph Fleischman, response to request for admission 60(F). The non-negotiability of the scope of Dome's indemnity indicates to First Jersey the importance of coverage for its actions as Dome's depositary, even though First Jersey was also covered for such action by the Employers Policy. While First Jersey's intent cannot determine the outcome of this case, it is consistent with the principle that the insured retain its general coverage. Dome must cover the loss if First Jersey is to have the benefit of its bargain as to both the Policy and the Depositary Agreement. The general-specific rule thus provides an alternative basis for summary judgment on defendants' behalf.

■ (c) *Transactional-contractual indemnification versus insurance.* Judge Stern also rejected, on law of the case grounds, defendants' argument that "an indemnitor becomes [sic] the ultimate risk of loss vis-a-vis an insurer." 635 F.Supp. at 1400. According to Judge Stern,

The Third Circuit explicitly considered this possibility in *Dome II* and rejected it: 'In this case, there is no indication of any mandatory public policy that would require that the risk of loss fall on a contractual indemnitor as opposed to an insurer ... [.] Thus we conclude that Dome and First Jersey were free to place contractually the ultimate risk of loss upon Employers to the extent permitted by Employers' policy with First Jersey.' *Dome II*, 767 F.2d at 46. For purposes of this litigation, therefore, the question is settled. *Zenith Labs, Inc. v. Carter-Wallace, Inc.*, 64 F.R.D. 159, 164 (D.N.J.1974), *aff'd*, 530 F.2d 508 (3d Cir. 1976), *cert. denied*, 429 U.S. 829, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976) (describing the doctrine of law of the case).

*Id.* The above-quoted passage from *Dome II* does not foreclose the "possibility" that the indemnitor, rather than the insurer, bears the ultimate risk of loss. Rather, the

---

**12.** Judge Stern rejected defendants' argument that the lack of limitation of the indemnity is significant relative to the $5 million limitation on the Policy. 635 F.Supp. at 1400. He did so because the "existence of the subrogation clauses here completely overwhelms any inference about intention to bear risk that can be made from the presence or absence of dollar limits." *Id.* This statement misses the point that suppletive rules are necessary precisely because Dome and Employers have sought to place the ultimate risk of loss on each other. *See Dome II*, 767 F.2d at 47. The Court will not disturb Judge Stern's rejection of this argument that the lack of a dollar limit in the indemnity alone requires Dome to bear the entire burden. However, the fact of the lack of limitation does support the primary-versus-excess coverage argument. Finally, while it may appear anomalous to hold that insurance is excess when the primary indemnity is without dollar limitation, such a result would be present if Employers had provided that the Policy was excess insurance in the event that the loss was subject to an indemnity as well as to other insurance.

Third Circuit foreclosed such a holding on the basis of mandatory public policy but expressly withheld judgment as to how, in the absence of an intent by Employers to be the ultimate risk bearer, the application of suppletive rules of law would allocate the risk. *Dome II*, 767 F.2d at 47.

Judge Stern also pointed out that the cases defendants cited in support of their indemnitor-versus-insurer argument were off point because "the indemnification agreements they concern did not contain subrogation clauses." 635 F.Supp. at 1401. This distinction does not dispose of these cases, however, if they provide for a suppletive rule that does not rely on the insurer's right to subrogation. If they do rely on the insurer's right to subrogation, then, as Judge Stern implied, they cannot aid defendants because both the Policy and the Depositary Agreement contain subrogation clauses.

In the only New Jersey case cited by defendants, the insurer reserved subrogation rights in its policy. *Brewster & Son, Inc. v. Catalytic Constr. Co.*, 17 N.J. 20, 27, 109 A.2d 805 (1954). In another of defendants' cited cases, the insurer enjoyed an equitable right to subrogation. *Maryland Casualty Co. v. Gough*, 146 Ohio St. 305, 65 N.E.2d 858, 864–65 (1946). In two cases, the courts relied on other cases in which the insurer of an indemnitee was subrogated to the indemnitee's rights against the indemnitor. *Spurr v. LaSalle Constr. Co.*, 385 F.2d 322, 331 (8th Cir. 1967) (citation omitted); *North Central Airlines v. City of Aberdeen*, 370 F.2d 129, 134 (1966) (citation omitted).

Finally, in *Lesmark, Inc. v. Pryce*, 334 F.2d 942 (D.C.Cir.1964), the indemnitor was held liable despite the existence of insurance and without any reference to the insurer's right to subrogation. The court noted the basis for its holding: "The indemnitor is not relieved from liability either on the theory [1] that the insurer is entitled to reimbursement out of the indemnitee's recovery, or [2] that the defendant should not benefit from a contract providentially made and paid for by the plaintiff." *Id.* at 945 n. 7 (quotation and citations omitted).

This first rationale reduces to the conclusion that the insurer is subrogated to claims by the insured/indemnitee against the indemnitor. The second rationale does not fully explain why the insurer must prevail over the indemnitor; however, it is consistent with the Court's conclusion above that the insured/indemnitee should be permitted to enjoy the benefits of insurance as well as indemnification. Thus, *Lesmark* supports defendants' position on grounds similar to the general-specific rule.

E. *The Affirmative Defenses*

 1. *Limitation of Suit Clause*

Finally, the Court will turn to defendants' affirmative defenses. *See Dome II*, 767 F.2d at 47. Defendants contend that Dome's subrogation claim is time-barred. The Policy provides in relevant part: "No action shall lie against the Company ... unless brought within twelve months after the amount of loss ... shall have been finally determined either by judgment or decree against the Insured or by agreed settlement with the consent of the Company." Policy at 2008. Employers' approval in June or July of 1981 of First Jersey's settlement with the State Street Group determined the amount of the loss within the meaning of the limitation of suit clause. Defendants argue that Dome's failure to bring suit within 12 months of this event renders Dome's subrogation claim untimely. Opening Brief at 51. Defendants concede that Dome did not receive the Employers Policy and loan receipt agreement immediately after Employers provided coverage but contend that Dome did receive it on May 14, 1982. *Id.* at 54 n. 36. Thus, Dome had access to the Policy, including the limitation of suit clause, more than one year before it filed suit on January 9, 1984.

Judge Stern rejected this defense:

 New Jersey, however, has interpreted such [limitation of suit] clauses to mean that suit may not be brought twelve months after the insurer has *refused* to pay a claim. *Peloso v. Hartford First [sic] Insurance Co.*, 56 N.J. 514, 521 [267 A.2d 498] (1970). Here, Employers, by lending the amount of the claim to First

Jersey during the pendency of the *Dome I* suit for indemnification, evidenced a willingness to pay. At least, there is no indication of a refusal to pay until Dome requested payment—a date well within the twelve-month limit.

635 F.Supp. at 1401 (emphasis added by Judge Stern). Thus, according to Judge Stern, the limitations period did not begin until Dome, after losing in *Dome I*, paid First Jersey and demanded payment from Employers under the subrogation clause in the Depositary Agreement. *See id.* Then, because Dome brought suit within 12 months of Employers' refusal to pay Dome, Judge Stern concluded that Dome's suit was timely. *Id.* Dome rests upon this holding. Opposition Brief at 21–22.[13]

In *Peloso*, the fire insurance policy provided, pursuant to statute, for a 12–month period after the "inception of loss" within which to bring suit. 56 N.J. at 517, 267 A.2d 498. The insureds gave notice promptly after a fire destroyed their property in September of 1965. *Id.* The insurer investigated the claim for several months, and the insurer's attorney put the denial of the claim in writing in June of 1966. *Id.* at 517–18, 267 A.2d 498. Plaintiffs did not sue until March 10, 1967. The Supreme Court of New Jersey held that the period of limitations runs from the date of casualty, *i.e.*, the fire, but that it is tolled from the time an insured gives notice until the insurer formally declines liability. *Id.* at 521, 267 A.2d 498. Under this rule, the insured's suit was timely. *Id.*

I am left with the unmistakable impression that Dome has misconstrued *Peloso*. The tolling rule set forth in *Peloso* has nothing to do with this case; Employers promptly approved First Jersey's settlement with the State Street Group. *Peloso* does not restrict the enforcement of limitation of suit clauses to cases in which the insurer refuses to pay a claim. *Peloso* does not address whether a subrogee must bring suit within one year of the insurer's payment of a claim. Judge Stern's ruling renders nugatory the text of the limitation

of suit clause, which provides that "[n]o action" may be brought more than one year "after the amount of loss ... shall have been finally determined ... by agreed settlement with the consent of the Company." Dome brought suit more than one year after First Jersey's settlement with the State Street Group, and, more importantly, more than one year after it received the Policy and the loan receipt agreement.

Two issues remain: was Dome's suit untimely, or does the clause relate only to (1) suits brought by the insured itself, as opposed to the subrogee; or (2) denials of coverage, as Judge Stern ruled?

First, the limitation of suit clause permits "[n]o action" after one year, without limitation to who brings the suit. Moreover, statutory limitation periods apply to subrogees. *Dow Chemical Corp. v. Weevil–Cide Co.*, 897 F.2d 481, 484 (10th Cir. 1990); *Silva v. Home Indemnity Co.*, 416 A.2d 664, 666–67 (R.I.1980); *Allstate Ins. Co. v. Metropolitan Dade County*, 436 So.2d 976, 980 (Fla.Dist.Ct.App.1983), *review denied*, 447 So.2d 885 (Fla.1984). The limitations periods in these cases were statutory rather than contractual. However, a 12–month limitation of suit clause is enforceable. *Staehle v. American Employers' Ins. Co.*, 103 N.J.Super. 152, 154, 246 A.2d 745 (App.Div.1968). There is no reason to distinguish here between contractual and statutory limitations periods.

Second, the terms of the limitation of suit clause do not limit the one-year period to cases in which Employers denies coverage. Employers and First Jersey agreed that Employers would be subject to suit for only one year after the loss. Under the limitation of suit clause, the loss could be determined, as it was here, by a settlement approved by Employers. Although Dome did not immediately know about the Policy and the loan receipt agreement, it received them in May of 1982. As of that time, Dome could have paid First Jersey and brought its subrogation claim. At that time Dome had reason to know that, if held liable, it might be subrogated to First Jer-

---

13. Dome stated twice that defendants ignore *Peloso*. Opposition Brief at 21, 22. However, defendants cited *Peloso*. Opening Brief at 52 n. 35.

sey's rights against Employers. It also had reason to know of the limitations period. Yet it waited for over a year and a half, after it lost before the Third Circuit, to pay First Jersey and sue it and Employers.

■ Dome's litigation of its liability to First Jersey did not toll the limitations period. In *Great American Ins. Co. v. United States*, an insurer had settled after three years of negotiation with its insured and then sought to be reimbursed by the United States under the Federal Tort Claims Act, which has a two-year statute of limitations. 575 F.2d 1031, 1033 & n. 2 (2d Cir.1978). The Second Circuit held that the claim against the Government was time-barred:

> The appellant claims that the result here was unjust since by the time his subrogation remedy accrued the statute had run. This of course is true in many cases—if the insurer resists any claim by reason of lack of coverage, misrepresentation, breach of warranty or whatever defense it may choose to rely upon, it always runs the risk that its delay will permit the statute to run.

*Id.* at 1035. *Accord Silva*, 416 A.2d at 667. Likewise, Dome's subrogation claim did not accrue until it had, under a court order, paid First Jersey; by that time, the 12–month period had run. Dome's failure to pay First Jersey and sue Employers within one year of receiving the policy and the loan receipt agreement rendered its suit untimely. Dome's failure to bring suit within one year of receiving the Policy and the loan receipt agreement constitutes an additional basis for granting summary judgment to defendants.

### 2. *Inequitable or Unconscionable Conduct*

■ Judge Stern rejected defendants' defense of inequitable conduct by ruling that the correct standard is unconscionability, rather than inequity, and that Dome's behavior was not unconscionable. 635

14. Judge Stern also doubted that equitable principles apply to a contractual subrogation clause. 635 F.Supp. at 1401. They do. *Providence*

F.Supp. at 1401 (citing *Standard Accident Ins. Co. v. Pellechia*, 15 N.J. 162, 175, 104 A.2d 288 (1954)).[14] Defendants now argue that the Third Circuit's references to "subrogation as an equitable device" and to Employers' "equitable defenses" set a standard of inequitable rather than unconscionable conduct. Opening Brief at 56 & n. 37 (citing *Dome II*, 767 F.2d at 45, 47). Defendants contend that Dome's conduct satisfies either standard.

Where subrogation rights are based on contract,

> [t]he courts do not require a showing by the subrogee of a superior equity, but rather *allow recovery as long as the conduct of the insurer and the insured has not been such as to make the granting of relief unconscionable.* The insurer steps into the shoes of the insured and can through subrogation enforce the contractual obligation of the third party.

*Pellechia*, 15 N.J. at 175, 104 A.2d 288 (emphasis added). *Accord Hartford Fire Ins. Co. v. Riefolo Constr. Co.*, 81 N.J. 514, 523, 410 A.2d 658 (1980) (quoting *Pellechia*). In *Riefolo*, the New Jersey Supreme Court used the terms "inequitable" and "unconscionable" interchangeably. 81 N.J. at 523, 410 A.2d 658. Defendants' argument that the Third Circuit set a standard of inequity rather than as one of unconscionability is without merit; the court never considered the defense other than to mention it. Since Judge Stern applied the correct standard, I will not disturb his decision on this issue.

### F. *Count IV*

In Count IV of its complaint, Dome claims that First Jersey destroyed Dome's subrogation claims by entering into the loan receipt agreement. Because the Court has held on other grounds that Dome has no right to subrogation, Count IV is not viable.

### G. *Pre–Judgment Interest*

Because defendants prevail, Dome's request for prejudgment interest is moot.

*Washington Ins. Co. v. Hogges*, 67 N.J.Super. 475, 482, 171 A.2d 120 (App.Div.1961).

### III. CONCLUSION

For the reasons set forth herein, the Court will grant summary judgment on defendants' behalf on Count I and Count IV. Final judgment will be entered on defendants' behalf dismissing this action with prejudice.